UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| MILORAD DODIK,<br>IGOR DODIK,<br>RADMILA BOJANIĆ,<br>PAVLE ĆOROVIĆ,<br>DANIJEL DRAGIČEVIĆ,<br>MARKO GUJANIČIĆ<br>DIJANA MILANOVIĆ,<br>DALIBOR PANIĆ,<br>GORAN RAKOVIĆ,<br>NEMANJA RELJIN, and<br>SEE MEDIA RESEARCH LTD (CYPRUS)<br><br>    *Plaintiffs*,<br><br>    v.<br><br>UNITED STATES DEPARTMENT OF THE<br>TREASURY; SCOTT BESSENT, in his official<br>capacity as Secretary of the Treasury; OFFICE OF<br>FOREIGN ASSETS CONTROL; PRESIDENT OF THE<br>UNITED STATES in his official capacity,<br>    *Defendants*. | Civ. Action No.: 1:26-cv-22587<br><br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

## INTRODUCTION

1. Plaintiffs bring this post-delisting complaint to obtain forward-looking and clean-up remedies after their removal from the Specially Designated Nationals and Blocked Persons ("SDN") List, while preserving a narrow challenge to agency enforcement predicated on Executive Order 14140 of January 8, 2025 ("E.O. 14140")(attached hereto as Exhibit 1).

2. This action challenges enforcement actions predicated on EO 14140, which amended and expanded the Western Balkans sanctions framework established by Executive Order 14033 of June 8, 2021 ("E.O. 14033") (attached hereto as Exhibit 2), and implemented by the Office of Foreign Assets Control ("OFAC") through the Western Balkans Stabilization Regulations, 31 C.F.R.

 GS2LAW

1

Part 588. EO 14140 was published at 90 Fed. Reg. 2589 (Jan. 13, 2025); EO 14033 at 86 Fed. Reg. 31079 (June 10, 2021).

3. Plaintiffs allege that E.O. 14140 was not executed with the President's contemporaneous decision and authorization when his signature was affixed by autopen.

4. Plaintiffs also allege that E.O. 14033 was not executed with the President's contemporaneous decision and authorization when his signature was affixed by autopen.

5. While the Department of Justice's Office of Legal Counsel has recognized that a President may lawfully direct a subordinate to affix his signature mechanically, that is lawful only if the President actually decides and authorizes the action. Absent such authorization, enforcement predicated on the instrument is ultra vires.

6. The dispositive legal question is authorization, not the mechanics of signature. Agency actions implementing E.O. 14140 (and E.O. 14033 as amended) were therefore ultra vires and, to the extent reviewable, arbitrary, capricious, and not in accordance with law.

7. In June 2025, the White House issued a Presidential Memorandum titled "Reviewing Certain Presidential Actions" (attached hereto as Exhibit 3), directing the Attorney General and Counsel to the President to review prior-administration processes, including the use of autopen and the authenticity of presidential authorization.

8. Plaintiffs seek targeted record production consistent with that memorandum to verify authorizations for E.O. 14140 E.O. 14033.

9. President Milorad Dodik openly supported President Donald J. Trump in 2024–25 through public endorsements and celebratory events. Plaintiffs allege that the lame-duck sanctions push culminating January 17, 2025, was motivated in retaliation for that political alignment.

**GS2LAW**

10. Public reporting and official actions in 2025 reflected controversy over the former President's use of autopen and questions about awareness of certain executive actions. The June 4, 2025, memorandum ordered a review, generally.

11. Plaintiffs do not ask the Court to resolve medical questions generally; they seek only adjudication of whether EO 14140 was actually authorized by the President when signed, and, if so, whether he had capacity to do so.

12. Although Plaintiffs were delisted on or about October 17, 2025 and October 29–30, 2025, the controversy is not moot. Collateral consequences persist in global sanctions-screening systems and counterparties' de-risking decisions; Plaintiffs face a credible risk of redesignation; and they seek vacatur of prior unlawful designation decisions and declaratory relief on presidential authorization.

13. The Executive Order remains in force; its legality (as applied or as to Plaintiffs) remains important to adjudicate.

**THE PARTIES**

14. Individual Plaintiffs are Republika Srpska officials or public figures, several of whom were designated by OFAC on January 17, 2025 under the Western Balkans program, specifically, Danijel Dragičević, Dijana Milanković, Dalibor Panić and Goran Raković.

15. Plaintiff President Milorad Dodik was designated  January 5, 2022 pursuant to E.O. 14033 for being responsible for or complicit in, or having directly or indirectly engaged in, a violation of, or an act that has obstructed or threatened the implementation of, the Dayton Peace Accords ("DPA").

GS2LAW

16. Plaintiff Igor Dodik, President Dodik's son, was designated  on October 20, 2023 pursuant to E.O. 14033 for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, President Dodik, a person whose property and interests in property are blocked pursuant to E.O. 14033.

17. Radmila Bojanić was designated on January 17, 2025,  pursuant to E.O. 14033, as amended, based on her role as director of Nimbus Innovations d.o.o., a previously sanctioned entity alleged to be controlled by Igor Dodik, and for purportedly acting on his behalf by providing business updates and seeking approval for company decisions, thereby being deemed to have owned, controlled, or acted for a blocked person.

18. Nemanja Reljin was designated on January 17, 2025,  pursuant to E.O. 14033, as amended, due to his ownership of Nimbus Innovations d.o.o., a previously designated entity alleged to be controlled by Igor Dodik, with OFAC attributing liability to him on the basis that he owned or controlled a blocked entity within the Dodik-associated network.

19. Pavle Ćorović was designated on January 17, 2025,  pursuant to E.O. 14033, as amended, based on his position as director of Global Liberty d.o.o., a previously sanctioned company, and his familial relationship to the Dodik family, with OFAC concluding that he owned or controlled, directly or indirectly, a blocked entity within the broader patronage network.

20. Marko Gujaničić was designated on January 17, 2025,  pursuant to E.O. 14033, as amended, for allegedly providing material assistance and support to Igor Dodik in connection with a media research and public polling scheme, including involvement in the formation and operation of SEE Media Research Ltd and efforts to influence or manipulate television viewership measurement in Bosnia and Herzegovina.

21. SEE Media Research Ltd was designated on January 17, 2025, pursuant to E.O. 14033, as amended, on the basis that it was owned or controlled by, or acted for or on behalf of, Marko Gujaničić, a designated individual, in connection with a media and polling enterprise alleged to support the Dodik network.

22. Defendant President of the United States is sued in his official capacity.

23. Defendant U.S. Department of the Treasury is a cabinet department that oversees OFAC.

24. Defendant Scott Bessent is the Secretary of the Treasury.

25. Defendant OFAC administers and enforces U.S. sanctions programs, including 31 C.F.R. Part 588.

**JURISDICTION AND VENUE**

26. This Court has jurisdiction under 28 U.S.C. §1331. Sovereign immunity is waived for non-monetary relief under 5 U.S.C. § 702; nonstatutory ultra vires claims are also available against agency officials.

27. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1), because the defendants are officers and agencies of the United States and may be sued in any judicial district in which a plaintiff resides or a substantial part of the events or omissions giving rise to the claims occurred.

28. Venue is further proper in this District because the blocking sanctions challenged herein have a direct and substantial impact on Plaintiffs' ability to access banking, correspondent accounts, and financial services in the Southern District of Florida, a global hub for U.S. and international banking.

29. As a result of the designations, U.S. financial institutions headquartered and operating in this District have cancelled or refused transactions, amplifying the injury suffered by Plaintiffs.

GS2LAW

30. Venue is further supported by the locus of injurious effects within the Southern District of Florida, including compliance communications with OFAC from this District; Plaintiffs do not rely solely on counsel's residence however, venue is further proper in this District because Plaintiffs' undersigned counsel resides and practices law in the Southern District of Florida. Litigating this matter here ensures efficiency and minimizes prejudice to Plaintiffs.

31. Alternatively, venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C), because Plaintiffs reside in this judicial district for purposes of this action by virtue of the location of their counsel and the locus of the sanctions' injurious effects within Florida's financial system.

32. Consistent with Supreme Court precedent limiting direct injunctions against the President, Plaintiffs seek coercive relief against subordinate officials and agencies; the President remains named solely to preserve requests for declaratory relief.

## STATUTORY AND REGULATORY BACKGROUND

33. E.O. 14033 (June 8, 2021) expanded the Western Balkans national emergency and authorized sanctions; E.O. 14140 (Jan. 8, 2025) further amended and broadened those authorities.

34. OFAC implements these authorities through the Western Balkans Stabilization Regulations, 31 C.F.R. Part 588, which define relevant terms, prohibitions, and licensing procedures.

35. Under the Federal Register Act, publication creates a presumption that a presidential document was duly issued, but that presumption is rebuttable and does not foreclose constitutional or authorization challenges. See 44 U.S.C. §§ 1505, 1507.

36. Office of Legal Counsel opinions recognize that the President may direct a subordinate to affix his signature provided the President actually decides and authorizes the action; the question is authorization, not penmanship. Plaintiffs invoke that framework here.

**RECENT DEVELOPMENTS AND NON-MOOTNESS**

37. On or about October 17, 2025, OFAC delisted Danijel Dragicevic, Goran Rakovic, and Dijana Milankovic from the SDN List.

38. On or about October 29, 2025, OFAC delisted the remaining designated Plaintiffs from the SDN List.

39. Collateral consequences persist notwithstanding delisting: sanctions-screening databases and counterparties continue to flag Plaintiffs; banks and vendors adopt conservative de-risking practices that do not immediately reverse upon delisting; and official records still reflect prior designations.

40. Designations triggered blocked assets, transaction bans with U.S. persons, and global de-risking. Post-delisting, those effects persist in screening systems and counterparties' risk models and cannot be remedied by money damages.

41. There remains a reasonable risk of redesignation under E.O. 14140 or successor instruments. This case thus falls within the voluntary-cessation and capable-of-repetition-yet-evading-review exceptions to mootness.[1]

42. Narrow, agency-focused relief that vacates unlawful actions, orders correction of records, and clarifies authorization requirements serves the public interest and avoids advisory rulings.

---

[1] On October 28, 2025, the House Committee on Oversight and Government Reform majority staff issued "*The Biden Autopen Presidency*," alleging deficiencies in documenting presidential authorization and use of an autopen for executive actions. Plaintiffs do not rely on that report for the truth of its assertions; they cite its issuance only to underscore the public controversy and the need for verification of authorization.  Further on December 2, 2025, President Trump declared that documents, including executive orders and pardons signed with an autopen during the administration of President Biden are null and void.

**FACTUAL ALLEGATIONS**

43. On June 8, 2021, E.O. 14033 was issued and was published on June 10, 2021 (86 Fed. Reg. 31079).

44. On January 8, 2025, E.O. 14140 was issued and was published on January 13, 2025 (90 Fed. Reg. 2589).

45. Following which, on January 17, 2025, OFAC announced designations under the Western Balkans program (attached hereto as Exhibit 4).   Several Individual Plaintiffs were among those designated. As a consequence, their property and interests in property subject to U.S. jurisdiction were blocked, and U.S. persons were broadly prohibited from dealings with them.

46. President Milorad Dodik was previously designated by OFAC in 2017 and again in 2022; later actions targeted his alleged network, who are the other plaintiffs. Those prior designations underscore the injury and the heightened consequences of the January 2025 actions.

47. There is credible, well-documented evidence that E.O. 14140's signature was affixed without contemporaneous presidential decision and authorization.

48. Plaintiffs seek a declaration and agency-focused injunctive relief tailored to that defect, together with record production of presidential authorization materials (including taskings, attestations, routing and Office of the Federal Register intake records) consistent with the June 4, 2025 Presidential Memorandum.

49. Public reporting and statements by senior officials raised questions about the former President's awareness of certain executive actions; the White House memorandum ordered review of autopen use and authorization controls.

50. Plaintiffs do not premise liability on medical assertions; they allege only that authorization for E.O. 14140 must be shown before agencies may enforce it.

**GS2LAW**

51. President Dodik has been a vocal supporter of President Trump, including through public statements and actions that demonstrate alignment with President Trump's policies and vision. For example, on November 4, 2024, Dodik issued an open letter urging the Serbian community in the U.S. to support President Trump, highlighting his understanding of Bosnia and Herzegovina's situation and commitment to sovereignty and traditional values.

52. On November 6, 2024, President Dodik extended congratulations to Trump on his election victory, expressing hope for refreshed U.S. relations with the world and Bosnia and Herzegovina, emphasizing shared values like family, freedom, and tradition. That same day, President Dodik hosted a cocktail party at the Palace of the Republic to celebrate President Trump's win and addressed citizens gathered outside to mark the occasion. The Palace was illuminated in the colors of the American flag in honor of the victory.

53. In interviews and statements throughout early 2025, such as on January 6, 2025, in Glas Srpske, President Dodik expressed optimism about President Trump's administration lifting sanctions and fostering neutral U.S. policy.

54. On January 16, 2025, in RT Balkan, President Dodik drew parallels between Republika Srpska's aspirations and President Trump's views on borders.

55. On January 17, 2025, in an author's text in Glas Srpske, President Dodik praised President Trump's return as promoting sovereignty and economic patriotism.

56. On January 20, 2025, via RTRS, President Dodik congratulated President Trump on his inauguration, sharing his vision of freedom and justice.

57. On January 24, 2025, via RTRS, President Dodik noted President Trump's arrival would change global and local dynamics.

58. On January 25, 2025, via Srna, President Dodik referenced President Trump's policies in announcing Republika Srpska's law on NGOs.

59. As part of this pattern of targeted sanctions, on January 17, 2025, OFAC, under the Biden administration, outrageously designated several Republika Srpska officials, Danijel Dragicevic, Goran Rakovic, Dalibor Panic and Dijana Milankovic, amongst others, simply for their roles in organizing and executing the commemoration of "Republika Srpska Day" on January 9, 2024.

60. The Biden Administration invoked the Dayton Peace Agreement to inhibit Republika Srpska's ability to celebrate its religious and national heritage, specifically citing that the event prioritized "the religious heritage, tradition, and customs of only the Serb people," which was deemed unconstitutional by the non-Serb dominated BiH Constitutional Court for violating non-discrimination obligations.

61. The High Representative, a German called Christian Schmidt, further characterized such celebrations of indigeneity by people indigenous to their own region as constituting a criminal offense under the BiH Criminal Code. This action is tantamount to acceding to blasphemy laws against Christians in their own land, as it criminalizes the expression of Serb Orthodox Christian traditions and cultural identity, thereby suppressing the free exercise of religion and national self-determination under the guise of enforcing the Dayton Peace Agreement

62. Plaintiffs allege, on information and belief, that the lame-duck OFAC actions were animated in part by retaliation for those expressions.

63. The national emergency with respect to the Western Balkans remains in effect, increasing the ongoing, irreparable harms of these designations absent prompt judicial relief.

64. Plaintiffs do not seek broad medical files. Rather, because authorization is the determinative legal question, Plaintiffs seek narrow, capacity-linked evidence for the discrete periods June 1- June 10, 2021 and January 1–12, 2025 including:

(a) any fitness-for-duty attestations or equivalent capacity certifications concerning the President's ability to knowingly authorize Executive Order 14033 on June 8, 2021 or authorize Executive Order 14140 on January 8, 2025; and

(b) any non-privileged White House Medical Unit (WHMU) routing or cover memoranda stating the President was fit to execute official acts on that date.

65. Plaintiffs request that any such materials be submitted in camera and subject to a HIPAA-qualified protective order.

66. To the extent Defendants contend that presidential authorization existed, Plaintiffs seek a sworn declaration from the White House Physician limited to whether, on or about June 8, 2021 or January 8, 2025, the President had the capacity to, and did, authorize issuance of E.O. 14033 or E.O. 14140.

67. Plaintiffs expressly do not seek treatment details, medications, or unrelated health information.

68. Because WHMU is a Department of Defense component, Plaintiffs will pursue third-party medical attestations under the Touhy regulations and applicable privacy laws, and request that the Court resolve any disputes by in-camera inspection and tailored redactions.

### FIRST CAUSE OF ACTION
### Nonstatutory Ultra Vires
**(Against Treasury/OFAC officials including the Secretary of the Treasury and the Director of OFAC, in their official capacities)**

69. Plaintiffs reallege paragraphs 1-64.

 GS2LAW

11

70. Enforcement actions predicated on E.O. 14033 are invalid if the order lacked actual presidential authorization at issuance. Agency officials cannot enforce an executive order ultra vires.

71. Enforcement actions predicated on E.O. 14140 are invalid if the order lacked actual presidential authorization at issuance. Agency officials cannot enforce an executive order ultra vires.

72. Plaintiffs seek equitable relief restraining Defendants from taking or maintaining any enforcement action predicated on E.O. 14033 or E.O. 14140 absent competent evidence of contemporaneous presidential authorization, and requiring correction and annotation of agency records to mitigate ongoing collateral harms.

## SECOND CAUSE OF ACTION
### Administrative Procedure Act (5 U.S.C. § 706)
### (Against OFAC/Treasury)

73. Plaintiffs reallege paragraphs 1-64.

74. OFAC actions taken under Part 588 that rely on a non-authorized Executive Order are "not in accordance with law" and "in excess of statutory authority," and are arbitrary and capricious. 5 U.S.C. § 706(2)(A), (C).

75. APA review and remedies are available against agencies and officials, with sovereign-immunity waived under 5 U.S.C. § 702.

76. OFAC's implementation of sanctions under E.O. 14033 and/or E.O. 14140 was arbitrary, capricious, and contrary to law because the underlying Executive Order is invalid due to the lack of contemporaneous presidential authorization for the signature mechanism used.

77. The Administrative Procedure Act requires agency actions to stem from lawful authority, which is lacking here.

78. No adequate administrative remedies exist, because there was no meaningful opportunity to contest the underlying authorization defect before collateral harms crystallized.

79. Plaintiffs seek vacatur of the prior designation decisions and expungement-style relief to address ongoing collateral consequences. Plaintiffs further seek:

    (a) completion and, if necessary, supplementation of the administrative records for reliance on E.O. 14033 and E.O. 14140 and for the January 17, 2025 designations, including all documents directly or indirectly considered by decisionmakers; and

    (b) a mandatory injunction directing correction of agency-maintained records and notice to major sanctions-screening vendors.

### THIRD CAUSE OF ACTION
**Article II (Declaratory Relief re: Presidential Authorization)**
**(Against all Defendants)**

80. Plaintiffs reallege paragraphs 1-64.

81. The Constitution vests the executive power in the President.

82. The physical act of signing may be delegated only when the President has decided and authorized the action.

83. Plaintiffs seek a declaration that E.O. 14140 is unenforceable as to these Plaintiffs unless and until Defendants produce competent evidence that the President contemporaneously decided and authorized its issuance as of January 8, 2025.

### FOURTH CAUSE OF ACTION
**Due Process Violation Under the Fifth Amendment**
**(Designated Individual Plaintiffs — Declaratory/Expungement Relief)**

84. Plaintiffs reallege paragraphs 1-64.

 GS2LAW

85. Blocking sanctions deprived designated Plaintiffs of significant property and liberty interests without constitutionally adequate process, especially where the underlying authorizing executive order is challenged.

86. Plaintiffs seek declaratory and expungement-style relief to remedy ongoing collateral consequences of those procedural defects.

87. Designations immediately block assets, bar transactions with U.S. persons, and trigger global "de-risking" by third-country institutions, harms not compensable by money damages.

88. The equities and public interest favor narrow, agency-focused relief that provides plaintiff-specific relief pending verification of presidential authorization and cleanses ongoing records-based harms.

**PRAYER FOR RELIEF**

Plaintiff respectfully requests that the Court:

i.   Declare that E.O. 14033 is unenforceable as to these Plaintiffs unless and until Defendants produce competent evidence that the President contemporaneously decided and authorized its issuance on June 8, 2021;

ii.  Declare that E.O. 14140 is unenforceable as to these Plaintiffs unless and until Defendants produce competent evidence that the President contemporaneously decided and authorized its issuance on January 8, 2025;

iii. Enter expungement-style relief directing Treasury/OFAC to:

(a) correct public records;



(b) notify relevant financial institutions and sanctions-screening vendors of Plaintiffs' delisting and the vacatur; and

(c) remove or annotate any government-maintained references suggesting Plaintiffs remain sanctioned;

iv.  Order completion and, if necessary, supplementation of the administrative record(s) for reliance on E.O. 14033, E.O. 14140 and for the January 17, 2025 designations, including all documents directly or indirectly considered by decisionmakers; and order targeted production, with in-camera review as appropriate, of discrete, non-privileged authorization materials (including taskings, directives, routing/clearance, Office of the Federal Register filings, and any Counsel/Attorney General attestations), consistent with the June 4, 2025 Presidential Memorandum

v.  Enjoin by way of a preliminary injunction under Fed. R. Civ. P. 65 Treasury/OFAC from redesignating Plaintiffs absent new, lawfully predicated record evidence and proof of valid presidential authorization for any reliance on E.O. 14033 and E.O. 14140;

vi.  Award reasonable costs and attorneys' fees as permitted by law; and

vii.  Grant such other and further relief as the Court deems just and proper.

Dated: April 14, 2026

GS2LAW PLLC

Robert Garson
FL Bar No. 1034548
20801 Biscayne Blvd, Suite 506
Aventura, FL 33180
(305) 780-5212
rg@gs2law.com
*Attorneys for Plaintiffs*

# Presidential Documents

> **Case 1:26-cv-22587**
>
> **Exhibit 1**

Executive Order 14140 of January 8, 2025

## Taking Additional Steps With Respect to the Situation in the Western Balkans

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, in view of events in the Western Balkans, including continued attempts by individuals to challenge the sovereignty and territorial integrity of Western Balkans nations, to undermine post-war agreements and institutions, to engage in significant corruption that erodes the rule of law and trust in democratic governance, and to evade United States Government sanctions, and in order to take additional steps with respect to the national emergency declared in Executive Order 13219 of June 26, 2001 (Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans), as amended by Executive Order 13304 of May 28, 2003 (Termination of Emergencies With Respect to Yugoslavia and Modification of Executive Order 13219 of June 26, 2001), and expanded in scope by Executive Order 14033 of June 8, 2021 (Blocking Property and Suspending Entry Into the United States of Certain Persons Contributing to the Destabilizing Situation in the Western Balkans), hereby order:

**Section 1**. *Amendments to Executive Order 14033*. Executive Order 14033 is hereby amended by striking section 1 and inserting, in lieu thereof, the following:

"**Section 1**. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, actions or policies that threaten the peace, security, stability, or territorial integrity of any area or state in the Western Balkans;

(ii) to be responsible for or complicit in, including by involvement in developing, or to have directly or indirectly engaged or attempted to engage in, actions or policies that undermine democratic processes or institutions in the Western Balkans;

(iii) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, a violation of, or an act that has obstructed or threatened the implementation of, any regional security, peace, cooperation, or mutual recognition agreement or framework or accountability mechanism, or to pose a significant risk of committing such an act, related to the Western Balkans, including the Prespa Agreement of 2018; the Ohrid Framework Agreement of 2001; United Nations Security Council Resolution 1244; the Dayton Accords; or the Conclusions of the Peace Implementation Conference Council held in London in December

1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council, or its Steering Board; or the International Criminal Tribunal for the former Yugoslavia, or, with respect to the former Yugoslavia, the International Residual Mechanism for Criminal Tribunals;

(iv) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, serious human rights abuse in the Western Balkans;

(v) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, corruption related to the Western Balkans, including corruption by, on behalf of, or otherwise related to a government in the Western Balkans, or a current or former government official at any level of government in the Western Balkans, such as the misappropriation of public assets, expropriation of private assets for personal gain or political purposes, or bribery;

(vi) to be a leader, official, or member of an entity, including a government entity, that has engaged in, or attempted to engage in, any of the activities described in subsections (1)(a)(i)–(v) of this order, or whose property and interests in property are blocked pursuant to this order;

(vii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order;

(viii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order;

(ix) to own or control, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order; or

(x) to be a spouse or adult child of any person whose property and interests in property are blocked pursuant to subsections (1)(a)(i)–(v) of this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.''

**Sec. 2**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other persons.

THE WHITE HOUSE,
*January 8, 2025.*

[FR Doc. 2025–00622
Filed 1–10–25; 8:45 am]
Billing code 3395–F4–P

31079

**Federal Register**

Vol. 86, No. 110

Thursday, June 10, 2021

# Presidential Documents

Case
1:26-cv-22587

Exhibit
2

**Title 3—**

**The President**

Executive Order 14033 of June 8, 2021

**Blocking Property and Suspending Entry Into the United States of Certain Persons Contributing to the Destabilizing Situation in the Western Balkans**

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13219 of June 26, 2001 (Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans), as amended by Executive Order 13304 of May 28, 2003 (Termination of Emergencies With Respect to Yugoslavia and Modification of Executive Order 13219 of June 26, 2001), finding that the situation in the territory of the former Socialist Federal Republic of Yugoslavia and the Republic of Albania (the Western Balkans), over the past two decades, including the undermining of post-war agreements and institutions following the breakup of the former Socialist Federal Republic of Yugoslavia, as well as widespread corruption within various governments and institutions in the Western Balkans, stymies progress toward effective and democratic governance and full integration into transatlantic institutions, and thereby constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States.

Accordingly, I hereby order:

**Section 1**. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to be responsible for or complicit in, or to have directly or indirectly engaged in, actions or policies that threaten the peace, security, stability, or territorial integrity of any area or state in the Western Balkans;

(ii) to be responsible for or complicit in, or to have directly or indirectly engaged in, actions or policies that undermine democratic processes or institutions in the Western Balkans;

(iii) to be responsible for or complicit in, or to have directly or indirectly engaged in, a violation of, or an act that has obstructed or threatened the implementation of, any regional security, peace, cooperation, or mutual recognition agreement or framework or accountability mechanism related to the Western Balkans, including the Prespa Agreement of 2018; the Ohrid Framework Agreement of 2001; United Nations Security Council Resolution 1244; the Dayton Accords; or the Conclusions of the Peace Implementation Conference Council held in London in December 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council, or its Steering Board; or the International Criminal Tribunal for the former Yugoslavia, or, with respect to the former Yugoslavia, the International Residual Mechanism for Criminal Tribunals;

**31080**    **Federal Register** / Vol. 86, No. 110 / Thursday, June 10, 2021 / Presidential Documents

(iv) to be responsible for or complicit in, or to have directly or indirectly engaged in, serious human rights abuse in the Western Balkans;

(v) to be responsible for or complicit in, or to have directly or indirectly engaged in, corruption related to the Western Balkans, including corruption by, on behalf of, or otherwise related to a government in the Western Balkans, or a current or former government official at any level of government in the Western Balkans, such as the misappropriation of public assets, expropriation of private assets for personal gain or political purposes, or bribery;

(vi) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order; or

(vii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

Sec. 2. The prohibitions in section 1 of this order include:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

Sec. 3. I hereby determine that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1(a) of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13219, as amended by Executive Order 13304, and as expanded in this order, and I hereby prohibit such donations as provided by section 1 of this order.

Sec. 4. (a) The unrestricted immigrant and nonimmigrant entry into the United States of noncitizens determined to meet one or more of the criteria in section l(a) of this order would be detrimental to the interests of the United States, and the entry of such persons into the United States, as immigrants or nonimmigrants, is hereby suspended, except when the Secretary of State or the Secretary of Homeland Security, as appropriate, determines that the person's entry would not be contrary to the interests of the United States, including when the Secretary of State or Secretary of Homeland Security, as appropriate, so determines, based on a recommendation of the Attorney General, that the person's entry would further important United States law enforcement objectives.

(b) The Secretary of State shall implement this order as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish.

(c) The Secretary of Homeland Security shall implement this order as it applies to the entry of noncitizens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

(d) Such persons shall be treated by this section in the same manner as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

**Sec. 5**. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 6**. For the purposes of this order:

(a) the term ''entity'' means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(b) the term ''noncitizen'' means any person who is not a citizen or noncitizen national of the United States;

(c) the term ''person'' means an individual or entity; and

(d) the term ''United States person'' means any United States citizen, lawful permanent resident, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 7**. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13219, as amended by Executive Order 13304, and as expanded by this order, there need be no prior notice of a listing or determination made pursuant to this order.

**Sec. 8**. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions within the Department of the Treasury. All executive departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

**Sec. 9**. Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, or contractors thereof.

**Sec. 10**. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*June 8, 2021.*

[FR Doc. 2021–12382
Filed 6–9–21; 11:15 am]
Billing code 3295–F1–P

*Administration of Donald J. Trump, 2025*

Case
1:26-cv-22587

Exhibit
3

**Memorandum on Reviewing Certain Presidential Actions**
*June 4, 2025*

*Memorandum for the Attorney General and the Counsel to the President*

*Subject:* Reviewing Certain Presidential Actions

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby directed:

*Section 1. Background.* The President of the United States, as the unitary head of the executive branch, holds tremendous power and responsibility through his signature: words on paper can become the law of the land, individuals are appointed to some of the highest offices in Government, national policies can be created or eliminated, and prisoners can go free. In sum, the Nation is governed through Presidential signatures.

In recent months, it has become increasingly apparent that former President Biden's aides abused the power of Presidential signatures through the use of an autopen to conceal Biden's cognitive decline and assert Article II authority. This conspiracy marks one of the most dangerous and concerning scandals in American history. The American public was purposefully shielded from discovering who wielded the executive power, all while Biden's signature was deployed across thousands of documents to effect radical policy shifts.

For years, President Biden suffered from serious cognitive decline. The Department of Justice, for example, concluded that, despite clear evidence that Biden had broken the law, he should not stand trial owing to his incompetent mental state. Biden's cognitive issues and apparent mental decline during his Presidency were even "worse" in private, and those closest to him "tried to hide it" from the public. To do so, Biden's advisors during his years in office severely restricted his news conferences and media appearances, and they scripted his conversations with lawmakers, government officials, and donors, all to cover up his inability to discharge his duties.

Notwithstanding these well-documented issues, the White House issued over 1,200 Presidential documents, appointed 235 judges to the Federal bench, and issued more pardons and commutations than any administration in United States history. For instance, just 2 days before Christmas in 2024, the White House announced that Biden commuted the sentences of 37 of the 40 most vile and monstrous criminals on Federal death row, including several child killers and mass murderers.

Although the authority to take these executive actions, along with many others, is constitutionally committed to the President, there are serious doubts as to the decision making process and even the degree of Biden's awareness of these actions being taken in his name.

The vast majority of Biden's executive actions were signed using a mechanical signature pen, often called an autopen, as opposed to Biden's own hand. This was especially true of actions taken during the second half of his Presidency, when his cognitive decline had apparently become even more clear to those working most closely with him.

Given clear indications that President Biden lacked the capacity to exercise his Presidential authority, if his advisors secretly used the mechanical signature pen to conceal this incapacity, while taking radical executive actions all in his name, that would constitute an unconstitutional wielding of the power of the Presidency, a circumstance that would have implications for the legality and validity of numerous executive actions undertaken in Biden's name.

1

*Sec. 2. Investigation.* (a) The Counsel to the President, in consultation with the Attorney General and the head of any other relevant executive department or agency (agency), shall investigate, to the extent permitted by law, whether certain individuals conspired to deceive the public about Biden's mental state and unconstitutionally exercise the authorities and responsibilities of the President. This investigation shall address:

(i) any activity, coordinated or otherwise, to purposefully shield the public from information regarding Biden's mental and physical health;

(ii) any agreements between Biden's aides to cooperatively and falsely deem recorded videos of the President's cognitive inability as fake;

(iii) any agreements between Biden's aides to require false, public statements elevating the President's capabilities; and

(iv) the purpose of these activities, including to assert the authorities of the President.

(b) The Counsel to the President shall also investigate, in consultation with the Attorney General and the head of any other relevant agency, the circumstances surrounding Biden's supposed execution of numerous executive actions during his final years in office. This investigation shall address:

(i) the policy documents for which the autopen was used, including clemency grants, Executive Orders, Presidential memoranda, or other Presidential policy decisions; and

(ii) who directed that the President's signature be affixed.

*Sec. 3. General Provisions.* This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

NOTE: An original was not available for verification of the content of this memorandum.

*Categories:* Communications to Federal Agencies : Certain Presidential actions, memorandum on review.

*Names:* Biden, Joseph R., Jr.

*Subjects:* Attorney General; Former President Joseph R. Biden, Jr., review of certain Presidential actions; Pardons and commutations; White House Counsel.

*DCPD Number:* DCPD202500659.

🇺🇸 An official website of the United States government  Here's how you know ⌄

# U.S. DEPARTMENT OF THE TREASURY

| Case 1:26-cv-22587 |
| Exhibit 4 |

# Treasury Sanctions Destabilizing Actors and Financial Enablers in Republika Srpska

January 17, 2025

*Using expanded sanctions authorities, Treasury sanctions Republika Srpska President Dodik's patronage network and individuals in Bosnia and Herzegovina for undermining regional peace and rule of law*

WASHINGTON – On January 8, 2025, the President issued [Executive Order (E.O.) 14140](), an amendment to [E.O. 14033](), which expanded the United States government's ability to curtail activity that undermines, or attempts to undermine, regional peace frameworks and the rule of law in the Western Balkans and efforts to circumvent U.S. sanctions.

Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) is designating five individuals and one entity that facilitate Republika Srpska (RS) President Milorad Dodik (Dodik) and his family's efforts to enrich themselves at the public's expense. Today's action also targets eight individuals who, at Dodik's direction, organized and executed the

commemoration of "Republika Srpska Day" (RS Day) in January 2024, in contravention to the principles of the Dayton Peace Agreement (DPA) and which the Bosnia and Herzegovina (BiH) Constitutional Court (CC) ruled unconstitutional.

"Today's action highlights Dodik's continued efforts to undermine the democratic and multiethnic framework that defines modern-day Bosnia and Herzegovina," said Acting Under Secretary of the Treasury for Terrorism and Financial Intelligence Bradley T. Smith. "The United States, leveraging our expanded authorities, remains committed to disrupting any attempts by Dodik and his cronies to enrich themselves and destabilize the region."

## SIGNIFICANT ACTORS CONTRIBUTING TO THE DODIK FINANCIAL NETWORK

The Dodiks' efforts to enrich themselves led to OFAC's October 20, 2023, June 18, 2024, November 6, 2024, and December 18, 2024 designations of core parts of the Dodiks' corrupt patronage network, including several entities and individuals under the direct control of Dodik's son, Igor Dodik (Igor). While Igor controls many of the companies in this network, he obfuscates his personal connection to the companies by relying on distinct owners and nominal directors. Today's action builds on OFAC's recent designations and utilizes the expanded authorities of E.O. 14033, as amended, to hinder attempts to circumvent sanctions.

BiH and Serbian national **Pavle Corovic** (Corovic) is the husband of Dodik's U.S.-designated daughter, Gorica Dodik (Gorica), and the director of U.S.-designated and RS-based Global Liberty d.o.o. Laktasi (Global Liberty) (both designated on October 20, 2023). Along with other Dodik-affiliated entities, Global Liberty has received lucrative incentives from the RS budget.

OFAC is designating Corovic pursuant to E.O. 14033, as amended, for owning or controlling, directly or indirectly, Global Liberty, a person whose property and interests in property are blocked pursuant to E.O. 14033.

BiH-based **Radmila Bojanic** (Bojanic)and **Nemanja Reljin** (Reljin) are the director and owner, respectively, of U.S.-designated Nimbus Innovations d.o.o. Banja Luka (Nimbus) (designated on December 18, 2024). Previously, both Bojanic and Reljin served in the same roles for Sirius 2010 d.o.o. Banja Luka (Sirius) (designated on June 18, 2024) before it formally merged with Nimbus. Both Nimbus and Sirius were designated for being controlled by Igor. Bojanic provided Igor with business updates and solicited Igor's approval before moving forward with business decisions.

OFAC is designating Bojanic and Reljin pursuant to E.O. 14033, as amended, for owning or controlling, directly or indirectly, Nimbus, a person whose property and interests in property are blocked pursuant to E.O. 14033. Bojanic is also being designated pursuant to E.O. 14033, as amended, for being owned or

controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Igor, a person whose property and interests in property are blocked pursuant to E.O. 14033.

To benefit from the businesses both directly and indirectly under his control, Igor relies upon strategic insights from associates responsive to his interests. For example, BiH national **Sinisa Dodik** (Sinisa) has reported to Igor on numerous high-level developments and has advised him on business opportunities. Igor and Serbian national **Marko Gujanicic** (Gujanicic) were publicly identified in a scheme related to media research and public polling in BiH wherein they sought to capitalize on a recent rule change, that was subsequently annulled by a BiH court for being unlawfully restrictive and contrary to the public interest. Both Igor and Gujanicic were involved in the formation of Cyprus-based **SEE Media Research LTD** (SEE Media Research) and local operations in BiH. Igor worked with associates between at least September 2023 and July 2024 to ensure that his preferred company would have a monopoly on measuring TV viewership. Additionally, Gujanicic informed Igor of a strategy to manipulate TV survey responses to further their goals.

OFAC is designating Sinisa and Gujanicic pursuant to E.O. 14033, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Igor, a person whose

Case 1:26-cv-22587-XXXX Document 1 Entered on FLSD Docket 04/15/2026 Page 30 of 34

property and interests in property are blocked pursuant to E.O.
14033.

OFAC is designating SEE Media Research pursuant to E.O. 14033,
as amended, for being owned or controlled by, or having acted or
purported to act for or on behalf of, directly or indirectly,
Gujanicic, a person whose property and interests in property are
blocked pursuant to E.O. 14033, as amended.

## ORGANIZERS OF REPUBLIKA SRPSKA DAY

On January 8–10, 2024, the RS government organized
celebrations of RS Day in defiance of prior BiH Constitutional
Court (CC) decisions that held that the commemoration of
January 9 unconstitutional due to its violation of the BiH
constitutional obligation of non-discrimination. These events
were explicitly organized by the RS government. Specifically,
Dodik personally oversaw and directed efforts to organize and
commemorate RS Day 2024. In response to these
commemorations of January 9, the High Representative stated
that the celebration of January 9 as RS Day represented "a clear
and direct failure to implement the final and binding decisions of
the BiH CC" and noted that such non-compliance with BiH CC
rulings constituted a criminal offense under the BiH criminal
code. By openly defying the decisions of both the BiH CC and High
Representative — two bodies whose authorities are enshrined in

the Dayton Peace Agreement (DPA) and are critical to upholding it — the actions undertaken by the RS government, and directed by Dodik, undermine the DPA.

BiH-based RS Minister of Interior **Sinisa Karan** (Karan), Chief of Staff in the Office of the RS President **Danijel Dragicevic** (Dragicevic), Head of the RS Protocol Office **Goran Rakovic** (Rakovic), RS Secretary General **Dalibor Panic** (Panic), Director of Radio Television Republika Srpska **Dijana Milankovic** (Milankovic), President of the RS Constitutional Court **Dzerard Selman** (Selman), President of the RS Academy of Arts and Sciences **Rajko Kuzmanovic** (Kuzmanovic), and Chief of Cabinet to the RS National Assembly (RSNA) Speaker **Goran Filipovic** (Filipovic) — alongside three additional members of the 2024 RS Day Organizing Committee whom the United States designated on [March 13, 2024](#) — proposed, adopted, and implemented the plan of events for the 2024 commemoration of RS Day.

Beyond his lead role in overseeing the 2024 event, Dodik more recently directed the planning of RS Day 2025. To assist in planning RS Day 2025, Dodik directed public officials — including Dragicevic, Karan, Milankovic, Selman, and Panic — to support various organizing efforts. All of these officials agreed to follow Dodik's instructions and worked to ensure RS Day 2025 events were organized according to his wishes. Karan, Dragicevic, Rakovic, Panic, Milankovic, Selman, and Kuzmanovic were

formally appointed to serve on the 2025 RS Day Organizing Committee by the RSNA. In spite of repeated declarations by the BiH CC and the High Representative, these officials have continued to engage in behavior that undermines the DPA.

In addition to these efforts, in 2024, Dodik instructed several Alliance of Independent Social Democrats (SNSD) officials to convene a working group to draft a plan for the RS to secede from BiH. Both Karan and Panic were part of this secessionist working group that drafted the secession plan for Dodik.

OFAC is designating Karan, Dragicevic, Rakovic, Panic, Milankovic, Selman, Kuzmanovic, and Filipovic pursuant to E.O. 14033, as amended, for being responsible for or complicit in, or having directly or indirectly engaged or attempted to engage in, a violation of, or an act that has obstructed or threatened the implementation of, any regional security, peace, cooperation, or mutual recognition agreement or framework or accountability mechanism, or posing a significant risk of committing such an act, related to the Western Balkans, including the Prespa Agreement of 2018; the Ohrid Framework Agreement of 2001; United Nations Security Council Resolution 1244; the Dayton Accords; or the Conclusions of the Peace Implementation Conference Council held in London in December 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council, or its Steering Board; or the International Criminal Tribunal for the former Yugoslavia, or, with

respect to the former Yugoslavia, the International Residual Mechanism for Criminal Tribunals.

## SANCTIONS IMPLICATIONS

As a result of today's action, all property and interests in property of the designated persons described above that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. In addition, any entities that are owned, directly or indirectly, individually or in the aggregate, 50 percent or more by one or more blocked persons are also blocked. Unless authorized by a general or specific license issued by OFAC or exempt, U.S. sanctions generally prohibit all transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of designated or otherwise blocked persons.

Violations of U.S. sanctions may result in the imposition of civil or criminal penalties on U.S. and foreign persons. OFAC may impose civil penalties for sanctions violations on a strict liability basis. OFAC's Economic Sanctions Enforcement Guidelines provide more information regarding OFAC's enforcement of U.S. economic sanctions. In addition, financial institutions and other persons may risk exposure to sanctions for engaging in certain transactions or activities with designated or otherwise blocked persons.

The power and integrity of OFAC sanctions derive not only from OFAC's ability to designate and add persons to the Specially Designated Nationals and Blocked Persons (SDN) List, but also from its willingness to remove persons from the SDN List consistent with the law. The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior. For information concerning the process for seeking removal from an OFAC list, including the SDN List, please refer to OFAC's Frequently Asked Question 897 here. For detailed information on the process to submit a request for removal from an OFAC sanctions list, please click here.

For identifying information on the individuals and entity sanctioned today, click here.

###