UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

MILORAD DODIK,
IGOR DODIK
RADMILA BOJANIĆ,
PAVLE ĆOROVIĆ,
DANIJEL DRAGIČEVIĆ,
MARKO GUJANIČIĆ,
DIJANA MILANOVIĆ,
DALIBOR PANIĆ,
GORAN RAKOVIĆ,
NEMANJA RELJIN, and
SEE MEDIA RESEARCH LTD,

*Plaintiffs,*

v.

UNITED STATES DEPARTMENT OF THE TREASURY; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; OFFICE OF FOREIGN ASSETS CONTROL; and the PRESIDENT OF THE UNITED STATES, in his official capacity,

Defendants.

Case No. 1:26-cv-22587-RAR-LFL

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## INTRODUCTION

1. Plaintiffs Milorad Dodik, Igor Dodik, Radmila Bojanić, Pavle Ćorović, Danijel Dragičević, Marko Gujaničić, Dijana Milanović, Dalibor Panić, Goran Raković, Nemanja Reljin, and SEE Media Research Ltd (collectively, "Plaintiffs") bring this First Amended Complaint against the United States Department of the Treasury ("Treasury"), Secretary Scott Bessent in his official capacity, the Office of Foreign Assets Control ("OFAC"), and the President of the United States in his official capacity, challenging the unlawful designation of Plaintiffs on the Specially Designated Nationals and Blocked Persons List ("SDN List") under Executive Orders 14033 and 14140.

2. The designations at issue were imposed without lawful presidential authorization, without adequate procedural protections, and in excess of the statutory authority delegated to OFAC. These designations caused severe, concrete, and ongoing financial harm to each Plaintiff, including the mandatory blocking of property within the United States, the termination of banking relationships by major U.S. and international financial institutions, and the continued exclusion from the global financial system even after formal delisting.

3. Although OFAC formally removed Plaintiffs from the SDN List in October 2025, the consequences of the unlawful designations persist. Major commercial sanctions-screening databases continue to flag Plaintiffs as formerly designated persons. Major U.S. and international financial institutions continue to refuse to restore banking relationships. Property that was blocked during the designation period has not been fully returned. The stigma of having been officially designated as threats to the national security of the United States continues to cause reputational, professional, and political harm.

4. This action seeks declaratory and injunctive relief, including vacatur of the underlying designations, expungement of all records thereof, a declaration that the executive orders authorizing the designations were issued without lawful presidential authorization, and nominal damages to redress the deprivation of Plaintiffs' constitutional rights.

**THE PARTIES**

5. Plaintiff Milorad Dodik was the President of Republika Srpska, a constituent entity of Bosnia and Herzegovina.

6. The U.S. Department of the Treasury first designated Milorad Dodik on July 17, 2017, under Executive Order 13304, and designated him again on January 5, 2022, under Executive Order 14033. On October 20, 2023, the Treasury designated Igor Dodik and Gorica Dodik.

7. His designation resulted in the immediate blocking of all property and interests in property within U.S. jurisdiction. As publicly reported, as a result of the designation, banks in Republika Srpska and the Federation of Bosnia and Herzegovina began closing accounts at the end of March 2024, and by April 2024 all bank accounts of companies owned by Gorica and Igor Dodik had been officially closed, including the “Agape” restaurant, owned by Gorica and Ivana Dodik; “Fruit eco,” owned by Igor Dodik and Mirko Dobric; Gorica Dodik’s humanitarian organization “Srpska kuca”; “Agro voce” company accounts; and “Global liberty,” co-owned by Igor Dodik.

8. The closures followed announcements by U.S. representatives that banks could also be subject to sanctions if they continued to cooperate with sanctioned persons. Milorad Dodik announced the establishment of a bank for internal payment transactions for sanctioned persons. Milorad Dodik was formally delisted in October 2025.

9. Plaintiff Igor Dodik is the son of Milorad Dodik and a businessman who was designated on the SDN List on October 20, 2023, under Executive Order 14033. His designation caused the immediate blocking of all property and interests in property within U.S. jurisdiction and the termination of banking relationships. As publicly reported, all bank accounts of companies owned by Igor Dodik, including “Fruit eco” and “Global liberty,” were officially closed by banks in both entities of Bosnia and Herzegovina. Igor Dodik was formally delisted in October 2025.

10. Plaintiff Radmila Bojanić is the director of Nimbus Innovations d.o.o. She was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. Her designation resulted

in the blocking of property subject to U.S. jurisdiction and the interruption of international financial transactions. Bojanić was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. She was formally delisted in October 2025.

11. Plaintiff Pavle Ćorović is the director of Global Liberty d.o.o. and is married to Gorica Dodik, the daughter of Milorad Dodik. He was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. His designation caused the blocking of property subject to U.S. jurisdiction, the termination of banking relationships, and the rejection of international financial transactions. Ćorović was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. He was formally delisted in October 2025.

12. Plaintiff Danijel Dragičević served as Chief of Staff in the Office of the President of Republika Srpska. He was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. His designation resulted in the blocking of property subject to U.S. jurisdiction and the interruption of international payment processing. Dragičević was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. He was formally delisted in October 2025.

13. Plaintiff Marko Gujaničić is involved in media operations, including SEE Media Research. He was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. His designation resulted in the blocking of property subject to U.S. jurisdiction and the cancellation or rejection of payments from international clients. Gujaničić was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. He was formally delisted in October 2025.

14. Plaintiff Dijana Milanović is the Director of Radio Television Republika Srpska (“RTRS”). She was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. Her designation resulted in the blocking of property and accounts subject to U.S. jurisdiction and the

interruption of international payments and business transactions. Milanović was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. She was formally delisted in October 2025.

15. Plaintiff Dalibor Panić served as Secretary General of Republika Srpska. He was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. His designation resulted in the blocking of property subject to U.S. jurisdiction and the termination of international payment processing capabilities. Panić was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. He was formally delisted in October 2025.

16. Plaintiff Goran Raković served as Head of the Protocol Office of the President of Republika Srpska. He was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. His designation resulted in the blocking of property subject to U.S. jurisdiction and the cancellation or rejection of international wire transfers. Raković was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. He was formally delisted in October 2025.

17. Plaintiff Nemanja Reljin is the owner of Nimbus Innovations d.o.o. He was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. His designation resulted in the blocking of corporate and personal property subject to U.S. jurisdiction and the cancellation or rejection of pending business transactions. Reljin was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. He was formally delisted in October 2025.

18. Plaintiff SEE Media Research Ltd is a Cypriot limited liability company engaged in media research and consulting services. It was designated on the SDN List on January 17, 2025, under Executive Orders 14033 and 14140. Its designation resulted in the immediate blocking of all company property and interests in property subject to U.S. jurisdiction, the termination of banking

relationships, and the cancellation or rejection of payments from clients processed through U.S. financial institutions. SEE Media Research Ltd was not subject to sanctions by the United Kingdom or any other foreign jurisdiction. It was formally delisted in October 2025.

19. Defendant United States Department of the Treasury is a department of the Executive Branch of the United States Government, headquartered in Washington, D.C. Treasury administers and enforces economic sanctions programs through OFAC.

20. Defendant Scott Bessent is the Secretary of the Treasury of the United States. He is sued in his official capacity. Secretary Bessent is responsible for the administration of Treasury, including the oversight of OFAC.

21. Defendant Office of Foreign Assets Control ("OFAC") is a component office within Treasury. OFAC administers and enforces economic sanctions programs, including the designation of persons on the SDN List. OFAC maintains a field office within the Southern District of Florida in Miami, Florida.

22. Defendant President of the United States is sued in his official capacity as the head of the Executive Branch. The President's authority under the International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq., is the purported legal basis for Executive Orders 14033 and 14140.

**JURISDICTION AND VENUE**

23. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 (federal question), 28 U.S.C. §1346 (United States as defendant), and 5 U.S.C. §§ 701–706 (Administrative Procedure Act). This Court also has jurisdiction under the Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202.

24. Venue is proper in this District pursuant to 28 U.S.C. § 1391(e)(1), which provides that in civil actions against officers or agencies of the United States, venue is proper in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or (C) the plaintiff resides, if no real property is involved.

25. Venue is proper in this District because OFAC maintains a field office within the Southern District of Florida in Miami, Florida. This office regularly processes sanctions-related compliance inquiries, issues specific licenses, and engages in enforcement actions affecting persons and institutions within this District.

26. Venue is further proper in this District because a substantial part of the events giving rise to Plaintiffs' claims occurred here. The Southern District of Florida is one of the nation's foremost international banking centers. Major U.S. financial institutions operating in this District, which serves as a primary hub for U.S. dollar-denominated international banking, were directly affected by Plaintiffs' SDN designations and were legally required to block Plaintiffs' property and reject financial transactions within this District.

27. Specifically, upon Plaintiffs' designation, financial institutions in this District received compliance alerts from OFAC, cross-referenced Plaintiffs' names against the SDN List through automated screening systems, and implemented blocks on pending wire transfers and correspondent banking transactions routed through their facilities in this District. These compliance actions, legally mandated by the designations at issue, constitute a substantial part of the events giving rise to Plaintiffs' claims.

28. Additionally, Plaintiffs' counsel, Robert Garson of GS2LAW PLLC, resides and practices in this District at 20801 Biscayne Boulevard, Suite 506, Aventura, Florida 33180.

29. Venue is also proper because the Southern District of Florida serves as a primary gateway for U.S. dollar-denominated international transactions involving European and Caribbean counterparties, including entities in Bosnia and Herzegovina and Cyprus.

**STATUTORY AND REGULATORY BACKGROUND**

**A. The International Emergency Economic Powers Act**

30. The International Emergency Economic Powers Act ("IEEPA"), 50 U.S.C. § 1701 et seq., authorizes the President to declare a national emergency with respect to an unusual and extraordinary threat to the national security, foreign policy, or economy of the United States that originates in whole or substantial part outside the United States.

31. Upon declaration of such an emergency, IEEPA authorizes the President to block property and interests in property of designated foreign persons, to prohibit transactions involving such property, and to regulate or prohibit financial transactions. 50 U.S.C. § 1702(a)(1)(B).

32. The President's authority under IEEPA is not self-executing. The President must personally authorize the exercise of these extraordinary powers. The delegation of implementation authority to Treasury and OFAC does not relieve the President of the constitutional obligation to personally authorize the executive orders that form the legal predicate for economic sanctions.

**B. Executive Order 14033**

33. On June 8, 2021, President Biden issued Executive Order 14033 (attached hereto as Exhibit 2), titled "Blocking Property and Suspending Entry Into the United States of Certain Persons Contributing to the Destabilizing Situation in the Western Balkans." E.O. 14033 declared a national emergency with respect to the situation in the Western Balkans and authorized the blocking of property of persons determined by the Secretary of the Treasury, in consultation with

the Secretary of State, to be responsible for or complicit in actions that threaten the peace, security, stability, or territorial integrity of any area or state in the Western Balkans.

34. E.O. 14033 was implemented through regulations codified at 31 C.F.R. Part 588 (the "Western Balkans Stabilization Regulations"). Under these regulations, all property and interests in property of designated persons that are in the United States, that come within the United States, or that are or come within the possession or control of any United States person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in. 31 C.F.R. § 588.201.

**C. Executive Order 14140**

35. On January 8, 2025, twelve days before the end of the Biden administration, Executive Order 14140 (attached hereto as Exhibit 1) was issued, purportedly amending and expanding the authorities established in E.O. 14033. E.O. 14140 broadened the criteria for designation and provided additional bases for blocking the property of persons associated with the Western Balkans.

36. E.O. 14140 was issued during the final days of the Biden administration, a period during which serious questions existed regarding presidential awareness and authorization of executive actions. As detailed below, E.O. 14140 bears indicia of having been issued via autopen without the personal knowledge or authorization of President Biden.

**D. The SDN List and Its Legal Consequences**

37. When a person is placed on the SDN List, the legal consequences are immediate, automatic, and severe. Specifically:

a. All property and interests in property of the designated person that are in the United States or within the possession or control of a U.S. person are immediately blocked. 31 C.F.R. § 588.201.

b. U.S. persons, including all U.S. financial institutions, are prohibited from engaging in any transactions or dealings with the designated person. *Id.*

c. U.S. financial institutions are required to block (freeze) any funds transferred to or through their institution on behalf of the designated person. 31 C.F.R. § 588.203.

d. Violations carry severe civil and criminal penalties, including fines of up to $368,136 per violation (civil) and up to 20 years imprisonment (criminal). 50 U.S.C. § 1705.

e. As a practical matter, SDN designation results in complete exclusion from the U.S. financial system and, because U.S. dollar transactions are intermediated through U.S. correspondent banks, effective exclusion from the global financial system.

## RECENT DEVELOPMENTS, NON-MOOTNESS, AND CONTINUING HARM

### A. Delisting Does Not Moot This Case

38. In October 2025, OFAC formally removed Plaintiffs from the SDN List. However, the delisting did not moot Plaintiffs' claims for the following independent reasons.

39. First, Plaintiffs continue to suffer concrete, ongoing collateral consequences of the designations that are not remedied by delisting alone:

a. Major commercial sanctions-screening databases continue to flag Plaintiffs as "formerly designated" or "previously sanctioned" persons. These databases are used by virtually all major financial institutions worldwide for anti-money-laundering and sanctions-

compliance screening. As of the date of this filing, Plaintiffs remain flagged in these databases.

b. Major U.S. financial institutions will refuse to reopen accounts for Plaintiffs or to resume processing wire transfers on their behalf. These institutions will cite Plaintiffs' historical SDN status and ongoing compliance risk as the basis for continued refusal, notwithstanding the formal delisting.

c. International correspondent banking relationships that were severed upon designation have not been fully restored. European and Middle Eastern financial institutions that rely on U.S. correspondent banks for dollar-clearing services still rely upon screening-database entries and "de-risking" policies.

d. The reputational stigma of having been officially designated by the United States Government as threats to national security continues to cause concrete harm to Plaintiffs' political, professional, and personal standing.

e. Third-country financial institutions, including banks in the European Union, the United Kingdom, and the Middle East, continue de-risking with respect to Plaintiffs based on the prior OFAC designation, independent of any UK sanctions.

40. Second, delisting does not operate retroactively to undo the legal consequences that attached during the period of designation. The blocking of Plaintiffs' property was a completed legal act that caused concrete financial harm; delisting does not provide a remedy for harm already inflicted.

41. Third, OFAC has never rescinded or withdrawn the factual findings underlying the designations. The administrative record on which the designations were based remains intact, creating an

ongoing official determination that Plaintiffs engaged in conduct threatening to the Western Balkans, a determination that continues to cause reputational and practical harm.

**B. Ongoing Susceptibility to Enhanced Due Diligence**

42. Even after delisting, Plaintiffs remain flagged in commercial sanctions-screening databases used by virtually every major financial institution worldwide for anti-money-laundering and counter-terrorism financing compliance. The persistent flags reflect Plaintiffs' prior OFAC designations and continue to be used in financial-institution and counterparty risk assessments.

43. That persistent flagging subjects Plaintiffs to enhanced due diligence ("EDD") every time they seek to open a bank account, process a wire transfer, enter into a commercial contract, or engage in any financial transaction anywhere in the world.

44. Under international compliance standards, including U.S. Bank Secrecy Act and anti-money-laundering requirements, the European Union's Anti-Money Laundering Directives, and the Recommendations of the Financial Action Task Force ("FATF"), financial institutions are required to conduct enhanced due diligence on persons who have been the subject of prior sanctions designations. This enhanced due diligence is not time-limited; it persists indefinitely because the prior designation remains a permanent feature of Plaintiffs' compliance profiles.

45. Treasury has expressly warned that financial institutions and other persons that engage in certain transactions or activities with sanctioned individuals may expose themselves to sanctions or be subject to an enforcement action. As a practical matter, enhanced due diligence dramatically increases the cost, delay, and uncertainty of every financial transaction Plaintiffs attempt. It often results in outright refusal of service by risk-averse institutions that prefer to de-risk rather than bear the compliance burden.

46. The only effective way to remedy this ongoing harm is vacatur and expungement of the underlying designations, coupled with affirmative notification to sanctions-screening database operators. That record-cleansing and notification remedy is not available through delisting alone and can be ordered only by this Court.

**C. The Unlawful Executive Order Remains on the Books as an Ongoing Threat**

47. Executive Order 14140 remains in full force and effect as a published legal authority. It has not been revoked, rescinded, or superseded.

48. E.O. 14140 was never properly signed or authorized by the President of the United States, as set forth in detail in this Complaint. Despite its constitutional infirmity, E.O. 14140 continues to provide OFAC with purported legal authority to designate any person determined by the Secretary of the Treasury to meet its broadly defined criteria. criteria that specifically and expressly target persons associated with the Western Balkans.

49. The continued existence of this unlawful executive order on the books means that Plaintiffs, and indeed any person associated with the Western Balkans, live under the perpetual threat that OFAC could invoke E.O. 14140 at any time, on a whim, to reimpose devastating sanctions without prior notice, without a hearing, and without judicial review.

50. This is not a hypothetical or speculative harm. OFAC has designated and redesignated Plaintiffs and persons in the Dodik network repeatedly. Treasury’s public releases identify designations within that network on October 20, 2023, June 18, 2024, November 6, 2024, December 18, 2024, and January 17, 2025, following Milorad Dodik’s designations in 2017 and 2022. These repeated designations and redesignations demonstrate a pattern of escalating enforcement against this specific group of Balkan-associated individuals. Treasury has also described the Dodik network as

pursuing an aggressive strategy to attempt to circumvent the effects of sanctions by restructuring and reestablishing corporate entities.

51. The continued existence of an unlawful executive order that can be weaponized against a specific, identifiable group of persons constitutes an ongoing constitutional injury that this Court has the power and the obligation to remedy. So long as E.O. 14140 remains on the books, Plaintiffs cannot conduct their personal, professional, or political affairs free from the shadow of arbitrary executive action predicated on an unauthorized instrument.

52. Plaintiffs seek a declaration that E.O. 14140 is void ab initio and an injunction requiring its formal revocation, thereby eliminating the ongoing threat it poses.

**D. The Voluntary Cessation Doctrine Preserves Jurisdiction**

53. The voluntary cessation doctrine prevents a defendant from mooting a case simply by ceasing the challenged conduct. Under this doctrine, "a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not reasonably be expected to recur." *Id.*

54. Defendants cannot meet this burden here because:

   a. OFAC retains full, unilateral, and unreviewable authority to redesignate Plaintiffs at any time without prior notice or hearing.

   b. The Western Balkans national emergency declared in E.O. 14033 remains in effect. The President has not terminated the national emergency. E.O. 14033 and E.O. 14140 remain in force as active legal authorities, and there are many people still sanctioned under this regime.

c. The government has made no binding commitment, whether by regulation, official policy statement, or formal representation to this Court, that it will not redesignate Plaintiffs.

d. The factual findings underlying the designations have never been rescinded or withdrawn, providing a ready-made basis for redesignation.

e. The political dynamics that led to the original designations, the tensions in the Western Balkans, the ongoing concerns about Republika Srpska, persist. OFAC's discretion to designate based on these same circumstances remains undiminished.

**E. The Capable-of-Repetition Exception Applies**

55. An otherwise-moot controversy is not actually moot if it is capable of repetition, yet evading review. This exception applies when (1) the challenged action is too short in duration to be fully litigated prior to cessation, and (2) there is a reasonable expectation that the same complaining party will be subject to the same action again.

56. Both elements are satisfied here. OFAC designations can be imposed and removed at any time without prior notice, making full litigation prior to cessation practically impossible. And there is a reasonable expectation of redesignation given that the underlying executive orders remain in force, the national emergency persists, and the factual findings have not been withdrawn.

57. Here, has made no commitment against redesignation.

## <u>FACTUAL ALLEGATIONS</u>

**A. The Designations and Their Immediate Effects**

58. On January 5, 2022, OFAC designated Plaintiff Milorad Dodik on the SDN List pursuant to E.O. 14033. The designation was based on OFAC's determination that President Dodik was

"responsible for or complicit in, or to have directly or indirectly engaged in" actions threatening the peace, security, stability, or territorial integrity of the Western Balkans.

59. Upon designation, all of Milorad Dodik's property and interests in property within the United States or within the possession or control of U.S. persons were immediately blocked by operation of law. The blocking included property, funds, and other financial interests subject to U.S. jurisdiction.

60. On October 20, 2023, OFAC designated Plaintiff Igor Dodik on the SDN List pursuant to E.O. 14033. Upon designation, all of Igor Dodik's property and interests in property within the United States or within the possession or control of U.S. persons were immediately blocked by operation of law, and pending financial transactions and banking relationships were terminated or rejected.

61. On January 17, 2025, OFAC designated the remaining individual Plaintiffs, Radmila Bojanić, Pavle Ćorović, Danijel Dragičević, Marko Gujaničić, Dijana Milanović, Dalibor Panić, Goran Raković, and Nemanja Reljin, and the entity Plaintiff SEE Media Research Ltd on the SDN List pursuant to E.O. 14033 and E.O. 14140 (as reflected in the OFAC press release attached hereto as Exhibit 4).

62. The January 17, 2025 designations occurred only nine days after E.O. 14140 was issued during the final days of the Biden administration. These designations triggered the same immediate, automatic legal consequences: all property and interests in property of these Plaintiffs within the United States or within the possession or control of U.S. persons were blocked, and all U.S. financial institutions were prohibited from engaging in any transactions with them.

63. Upon the January 17, 2025 designations, compliance departments at major U.S. financial institutions automatically froze or terminated accounts and blocked wire transfers involving the

newly designated Plaintiffs, as required by 31 C.F.R. Part 588 and enforced by the threat of severe civil and criminal penalties.

**B. Concrete Injuries in the Southern District of Florida**

64. The designations caused specific, concrete financial harm within the Southern District of Florida. Financial institutions operating in this District, which serves as a primary hub for U.S. dollar-denominated international banking involving European, Latin American, and Caribbean counterparties, were directly and immediately affected.

65. Specifically, upon Plaintiffs' designations, banks operating in this District received OFAC compliance notifications and were required to: (a) screen all pending and future transactions against the updated SDN List; (b) reject or block any wire transfers involving Plaintiffs that were processed through correspondent banking facilities in Miami-Dade and Broward Counties; (c) freeze any funds belonging to Plaintiffs held in accounts at branches in this District; and (d) report all blocked property to OFAC within ten business days as required by 31 C.F.R. § 501.603.

**C. The OFAC Designation, Not UK Sanctions, Caused Plaintiffs' Injuries**

66. Plaintiff Milorad Dodik was separately designated by the United Kingdom on April 11, 2022, approximately three months after his OFAC designation. However, the injuries alleged herein are directly and independently caused by the OFAC SDN designation, not the UK sanctions, for the following reasons:

    a. The OFAC SDN designation independently and automatically triggered mandatory legal prohibitions on ALL U.S. persons and institutions under U.S. law. These legal prohibitions exist regardless of whether any other country has imposed separate sanctions.

b. U.S. financial institutions are obligated to comply with OFAC regulations under threat of severe civil and criminal penalties. The UK sanctions did not require, and could not legally compel, U.S. financial institutions to block assets or refuse transactions. Only the OFAC designation imposed that legal obligation.

c. U.S. financial institutions terminated their relationships with Milorad Dodik in January 2022, upon his OFAC designation, before the UK sanctions were imposed in April 2022. The temporal sequence conclusively establishes that the OFAC designation, not the later UK action, was the cause of the U.S. banking exclusion.

d. On information and belief, the United Kingdom's decision to designate Milorad Dodik on April 11, 2022, was prompted by and derivative of the prior United States OFAC designation. The United Kingdom acted only after the United States had already designated Dodik and publicly identified him as a threat to the Dayton Peace Accords. The UK's stated basis for designation, that Dodik "had driven action to withdraw Republika Srpska from key State institutions, using divisive, dangerous, nationalist rhetoric, undermining domestic and regional peace and encouraging ethnic hatred and genocide denial," substantially mirrors the rationale that OFAC had already published in its January 5, 2022 press release. Absent the U.S. designation, the United Kingdom would not have independently sanctioned Dodik. Accordingly, the OFAC designation was the but-for cause of Plaintiffs' global financial exclusion, as even the subsequent foreign sanctions action flowed from the United States' initiative.

e. Most critically, the remaining nine individual Plaintiffs, Igor Dodik, Bojanić, Ćorović, Dragičević, Gujaničić, Milanović, Panić, Raković, and Reljin, and the entity Plaintiff SEE

Media Research Ltd were never subject to UK sanctions. These Plaintiffs were designated only by OFAC, yet suffered the identical pattern of financial exclusion from U.S. institutions. The fact that non-UK-sanctioned Plaintiffs suffered the same injuries conclusively demonstrates that the OFAC designation, not UK action, caused the harm.

f. The January 17, 2025 designations of the additional Plaintiffs occurred solely under U.S. executive orders, with no corresponding UK action. No country other than the United States designated these Plaintiffs.

**D. The Autopen Issue and Lack of Presidential Authorization**

67. Executive Order 14140 was issued on January 8, 2025, during the final twelve days of the Biden administration. Serious questions exist regarding whether President Biden personally reviewed and authorized E.O. 14140.

68. On June 4, 2025, President Trump issued a Presidential Memorandum titled "Reviewing Certain Presidential Actions" (attached hereto as Exhibit 3), ordering an investigation into the use of the autopen device during the Biden administration to sign executive orders and other presidential actions without the personal knowledge or authorization of President Biden.

69. On December 2, 2025, President Trump declared that executive orders and other documents signed by autopen without presidential awareness are "null and void." This declaration specifically raised concerns about documents issued during the final months of the Biden administration when, according to public reporting and official White House communications, President Biden's cognitive capacity and personal involvement in day-to-day governance were subjects of serious concern.

70. The House Oversight Committee report titled "The Biden Autopen Presidency" documented systematic deficiencies in the authorization and review process for presidential actions during the Biden administration, including evidence that the autopen was used to sign executive orders and other legally consequential documents without the President's personal review or awareness.

71. E.O. 14140, issued on January 8, 2025, bears indicia of autopen execution. It was issued during a period when multiple executive orders and presidential actions were produced in rapid succession, and during which the sitting President's personal involvement in governance was the subject of bipartisan concern. If E.O. 14140 was issued via autopen without the personal authorization of the President, it is constitutionally void *ab initio*, and all actions taken pursuant to it, including the January 17, 2025 designations of nine Plaintiffs, are without legal effect.

72. This is not a claim of ordinary agency error or mere procedural irregularity. It is a fundamental constitutional defect: the enforcement of executive orders under IEEPA requires personal presidential authorization, and the exercise of this extraordinary power without such authorization is ultra vires in the most fundamental sense. The Constitution vests executive power in the President personally, and the delegation of IEEPA authority requires presidential action, not the action of unnamed staff wielding a mechanical signature device.

**E. Due Process Violations and Contacts with the United States**

73. Each Plaintiff had cognizable liberty interests that were deprived by the SDN designations without adequate procedural protections.

74. The SDN designation deprived Plaintiffs of significant liberty interests, including:

a. The stigma of being officially designated by the U.S. Government as persons who threaten the national security of the United States, a designation that brands Plaintiffs as threats comparable to terrorists, narcotics traffickers, and weapons proliferators;

b. Exclusion from the global financial system, which in the modern world constitutes a severe restraint on personal and professional liberty;

c. Inability to conduct ordinary business transactions, receive salary or compensation, or engage in routine commercial activity;

d. Restrictions on international travel, as airlines, hotels, and travel service providers screen customers against the SDN List and refuse service to designated persons; and

e. Reputational harm affecting political and professional standing, including the ability to hold public office, conduct diplomatic business, and maintain professional relationships.

75. Plaintiffs had substantial contacts with the United States sufficient to invoke due process protections in that SDN designation itself created a substantial and involuntary connection to U.S. jurisdiction by blocking property subject to U.S. law and subjecting Plaintiffs to ongoing U.S. regulatory authority

76. The SDN designation operates as a *per se* deprivation of property and liberty, it automatically blocks all property and interests in property subject to U.S. jurisdiction and effectively excludes the designated person from economic participation in the United States. This level of coercive government action directed at specific individuals triggers due process protections regardless of physical location.

77. The designations were imposed without any pre-deprivation hearing or opportunity to be heard. OFAC did not provide Plaintiffs with notice of the proposed designations, access to the evidence

upon which the designations were based, or an opportunity to contest the designations before they took effect. The post-deprivation administrative reconsideration process available under 31 C.F.R. § 501.807 is constitutionally inadequate because it does not provide for disclosure of the government's evidence, does not provide for an evidentiary hearing, and is decided by the same agency that imposed the designation.

**F. Redressability**

78. A favorable decision in this case would redress Plaintiffs' injuries in multiple concrete ways:

   a. Vacatur of the designations and expungement of the administrative record would remove the legal and historical basis for the entries in sanctions-screening databases that continue to exclude Plaintiffs from the financial system. OFAC would be required to notify sanctions-screening database vendors of the vacatur, directly redressing the screening-database harm.

   b. A declaration that the executive orders are unenforceable, because they were issued without presidential authorization, would eliminate the legal basis for any ongoing compliance obligations by U.S. financial institutions, thereby removing the legal impediment to Plaintiffs' financial inclusion.

   c. A judicial determination that the designations were unlawful would materially alter the risk calculus for financial institutions considering whether to restore Plaintiffs' banking relationships. Unlike mere delisting, which leaves open the possibility that the designation was lawful but simply discontinued, a judicial declaration of unlawfulness would negate the reputational and compliance concerns that currently prevent rebanking.

d. Redressability does not require certainty that financial institutions will resume business with Plaintiffs. It requires only that a favorable decision would “significantly increase the likelihood” of redress. *Utah v. Evans*, 536 U.S. 452, 464 (2002). Vacatur and expungement would unquestionably increase the likelihood that sanctions-screening databases would remove their flags and that financial institutions would restore relationships.

e. An award of nominal damages would independently redress the constitutional violation.

## CAUSES OF ACTION

### COUNT I
NONSTATUTORY ULTRA VIRES
(Against Treasury, Secretary Bessent, and OFAC)

79. Plaintiffs incorporate by reference paragraphs 1 through 4 (Introduction), paragraphs 5 through 22 (Parties), paragraphs 30 through 36 (Statutory and Regulatory Background), paragraphs 38 through 52 (Non-Mootness and Continuing Harm), and paragraphs 58 through 72 (Factual Allegations regarding designations, autopen, and presidential authorization).

80. Federal courts possess inherent authority to review and set aside agency action that is *ultra vires*, that is, action taken in excess of the agency’s lawful authority.

81. Ultra vires review is appropriate where an agency has acted in excess of its delegated powers and contrary to a specific prohibition or where the agency’s action represents an extreme agency error that renders the action void.

82. OFAC’s authority to designate persons on the SDN List derives exclusively from executive orders issued by the President pursuant to IEEPA. OFAC has no independent statutory authority to impose sanctions absent a valid presidential directive. The designation authority is not inherent in the agency; it exists only to the extent delegated by lawful presidential action.

83. Executive Order 14140, issued on January 8, 2025, was not lawfully authorized by the President. As alleged in detail above, E.O. 14140 was issued via autopen during the final days of the Biden administration without the personal knowledge or authorization of President Biden. The June 4, 2025 Presidential Memorandum ordering investigation into autopen use, the December 2, 2025 presidential declaration that autopen-signed documents are "null and void," and the House Oversight Committee report "The Biden Autopen Presidency" all support the conclusion that E.O. 14140 was never personally authorized by the President.

84. Because E.O. 14140 was never lawfully issued, it is void ab initio. OFAC's January 17, 2025 designations of nine Plaintiffs, which relied on E.O. 14140 as a legal basis, were therefore made without lawful delegated authority. OFAC acted *ultra vires.*

85. This is not ordinary agency error or a routine exercise of discretion. It is a fundamental constitutional defect: an agency exercised extraordinary power to freeze the assets and destroy the financial lives of eleven persons based on an executive order that was never authorized by the constitutional officer in whom executive power is vested. This represents precisely the type of "extreme agency error" that ultra vires review is designed to address.

86. Even with respect to the designations of Milorad Dodik and Igor Dodik under E.O. 14033, the ultra vires claim is viable because OFAC's administration of the designations was infected by the same systemic deficiency: the agency failed to verify presidential authorization of the legal predicates for its actions, and its continued enforcement of designations under executive orders whose legitimacy has been called into question by the sitting President constitutes action in excess of lawful authority.

**COUNT II**

VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT, 5 U.S.C. § 706

(Against Treasury and OFAC)

87. Plaintiffs incorporate by reference paragraphs 1 through 4 (Introduction), paragraphs 5 through 22 (Parties), paragraphs 30 through 36 (Statutory and Regulatory Background), paragraphs 38 through 52 (Non-Mootness and Continuing Harm), paragraphs 58 through 72 (Factual Allegations regarding designations, autopen, and presidential authorization), and paragraphs 78 through 78 (Redressability).

88. The Administrative Procedure Act ("APA"), 5 U.S.C. § 706, provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be (A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law."

89. OFAC's designations of Plaintiffs were "not in accordance with law" because they were based on E.O. 14140, which was issued without lawful presidential authorization and is therefore void. Agency action taken pursuant to a void executive order is inherently unlawful.

90. OFAC's designations were "in excess of statutory jurisdiction, authority, or limitations" because OFAC's authority to designate derives exclusively from valid presidential delegation under IEEPA. Where the predicate executive order is void, the delegation of authority is void, and the agency acts without legal authority.

91. OFAC's designations were "arbitrary, capricious, [and] an abuse of discretion" because they were imposed in the final days of an outgoing administration, based on an executive order issued

during a period of documented concerns regarding presidential capacity, without adequate consideration of the severe consequences to the designated persons, and without any meaningful pre-deprivation process.

92. OFAC's designations were "without observance of procedure required by law" because the mandatory requirement of presidential authorization, a procedural prerequisite to the valid exercise of IEEPA authority, was not satisfied.

93. Under 5 U.S.C. § 706, this Court should vacate OFAC's designations of Plaintiffs, expunge all records of such designations, and order OFAC to notify all sanctions-screening database vendors of the vacatur.

**COUNT III**
ARTICLE II DECLARATORY RELIEF REGARDING PRESIDENTIAL AUTHORIZATION
(Against All Defendants)

94. Plaintiffs incorporate by reference paragraphs 1 through 4 (Introduction), paragraphs 5 through 22 (Parties), paragraphs 30 through 36 (Statutory and Regulatory Background), paragraphs 47 through 52 (The Unlawful Executive Order Remains on the Books), and paragraphs 67 through 72 (The Autopen Issue and Lack of Presidential Authorization).

95. Article II of the United States Constitution vests "the executive Power" in "a President." U.S. Const. art. II, § 1. The President's authority under IEEPA, including the authority to declare national emergencies and to issue executive orders blocking the property of foreign persons, is a personal exercise of executive power that cannot be delegated to staff or exercised through mechanical devices without the President's knowledge and authorization.

96. The Declaratory Judgment Act, 28 U.S.C. §§ 2201–2202, authorizes this Court to "declare the rights and other legal relations of any interested party seeking such declaration."

97. An actual controversy exists between the parties regarding whether Executive Order 14140 was lawfully authorized by the President of the United States. If E.O. 14140 was signed by autopen without the personal knowledge or authorization of President Biden, it is void ab initio as a matter of constitutional law.

98. Plaintiffs are entitled to a declaratory judgment that:

a. Executive Order 14140 was not lawfully authorized by the President of the United States;

b. Executive Order 14140 is void ab initio and has no legal force or effect;

c. All designations made pursuant to E.O. 14140 are without legal authority and void; and

d. OFAC had no lawful authority to designate Plaintiffs pursuant to E.O. 14140 and is required to expunge all records of such designations.

**COUNT IV**
VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT
(Against All Defendants, Individual Plaintiffs)

99. The individual Plaintiffs, Milorad Dodik, Igor Dodik, Radmila Bojanić, Pavle Ćorović, Danijel Dragičević, Marko Gujaničić, Dijana Milanović, Dalibor Panić, Goran Raković, and Nemanja Reljin, incorporate by reference paragraphs 1 through 4 (Introduction), paragraphs 5 through 22 (Parties), paragraphs 37 (SDN List Legal Consequences), paragraphs 38 through 46 (Delisting, Collateral Consequences, and Enhanced Due Diligence), paragraphs 58 through 65 (Designations and Concrete Injuries), and paragraphs 73 through 77 (Due Process Violations and Contacts with the United States).

100. The Due Process Clause of the Fifth Amendment provides that no person shall "be deprived of life, liberty, or property, without due process of law." U.S. Const. amend. V.

101. The individual Plaintiffs possess cognizable property interests protected by the Due Process Clause, including: the right to access and use the U.S. financial system; and investment interests administered by U.S. financial institutions. These property interests were directly and immediately deprived by the SDN designations.

102. The individual Plaintiffs possess cognizable liberty interests protected by the Due Process Clause, including: freedom from government-imposed stigma as national security threats; the ability to engage in ordinary financial and commercial activity; the ability to travel internationally without being flagged and refused service; and professional and political reputation. These liberty interests were directly and immediately deprived by the SDN designations.

103. The individual Plaintiffs had sufficient contacts with the United States to invoke due process protections. They maintained property within U.S. jurisdiction, engaged in regular financial transactions with U.S. persons and entities, and were subjected to the coercive regulatory authority of the United States through the designation process. The SDN designation itself, by blocking property subject to U.S. law and subjecting Plaintiffs to ongoing U.S. regulatory authority, created substantial and involuntary connections to U.S. jurisdiction.

104. The SDN designations deprived the individual Plaintiffs of these property and liberty interests without adequate procedural protections. Specifically:

a. OFAC provided no pre-deprivation notice or hearing before imposing the designations;

b. OFAC did not disclose to Plaintiffs the evidence upon which the designations were based, either before or after designation;

c. OFAC did not provide Plaintiffs with a meaningful opportunity to contest the designations before the deprivation of property and liberty took effect;

d. The post-deprivation administrative reconsideration process under 31 C.F.R. § 501.807 is constitutionally inadequate because it does not require OFAC to disclose the basis for designation, does not provide for an evidentiary hearing, does not provide for cross-examination or confrontation of evidence, is decided by the same agency that imposed the designation, and operates under no enforceable timeline; and

e. The designations were imposed as fait accompli, with immediate and devastating financial consequences, while the only available "remedy" was a non-adversarial petition to the very agency that decided to designate in the first place.

105. The individual Plaintiffs are entitled to a declaration that the designations violated their right to due process under the Fifth Amendment, vacatur of the designations, expungement of all records thereof, and nominal damages for the constitutional violation.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and grant the following relief:

A. declaratory judgment that the designations of Plaintiffs on the SDN List were unlawful, ultra vires, in violation of the Administrative Procedure Act, and in violation of the Due Process Clause of the Fifth Amendment;

B. A declaratory judgment that Executive Order 14140 was not lawfully authorized by the President of the United States and is void ab initio;

C. A declaratory judgment that all designations made pursuant to Executive Order 14140 are without legal authority and void;

D. An order vacating OFAC's designations of Plaintiffs on the SDN List and expunging all records thereof from OFAC's databases;

E. An order requiring OFAC to notify all sanctions-screening database vendors of the vacatur and to request removal of all references to Plaintiffs' prior designations;

F. A permanent injunction requiring formal revocation of Executive Order 14140 and prohibiting Defendants from redesignating Plaintiffs on the SDN List based on the same factual predicates underlying the vacated designations;

G. An award of nominal damages to each individual Plaintiff in the amount of one dollar ($1.00) for the violation of their constitutional rights under the Due Process Clause of the Fifth Amendment;

H. An award of reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412 (the Equal Access to Justice Act); and

I. Such other and further relief as this Court deems just and proper.

Dated: August 25, 2026

Respectfully submitted,

**GS2LAW PLLC**

______________________

Robert Garson
FL Bar No. 1034548
20801 Biscayne Blvd, Suite 506
Aventura, FL 33180
(305) 780-5212
rg@gs2law.com
*Attorneys for Plaintiffs*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on August 25, 2026, I electronically filed the foregoing First Amended Complaint for Declaratory and Injunctive Relief with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ Robert Garson

Robert Garson

# Presidential Documents

Case 1:26-cv-22587

Exhibit 1

**Executive Order 14140 of January 8, 2025**

## Taking Additional Steps With Respect to the Situation in the Western Balkans

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, in view of events in the Western Balkans, including continued attempts by individuals to challenge the sovereignty and territorial integrity of Western Balkans nations, to undermine post-war agreements and institutions, to engage in significant corruption that erodes the rule of law and trust in democratic governance, and to evade United States Government sanctions, and in order to take additional steps with respect to the national emergency declared in Executive Order 13219 of June 26, 2001 (Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans), as amended by Executive Order 13304 of May 28, 2003 (Termination of Emergencies With Respect to Yugoslavia and Modification of Executive Order 13219 of June 26, 2001), and expanded in scope by Executive Order 14033 of June 8, 2021 (Blocking Property and Suspending Entry Into the United States of Certain Persons Contributing to the Destabilizing Situation in the Western Balkans), hereby order:

**Section 1**. *Amendments to Executive Order 14033*. Executive Order 14033 is hereby amended by striking section 1 and inserting, in lieu thereof, the following:

"**Section 1**. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, actions or policies that threaten the peace, security, stability, or territorial integrity of any area or state in the Western Balkans;

(ii) to be responsible for or complicit in, including by involvement in developing, or to have directly or indirectly engaged or attempted to engage in, actions or policies that undermine democratic processes or institutions in the Western Balkans;

(iii) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, a violation of, or an act that has obstructed or threatened the implementation of, any regional security, peace, cooperation, or mutual recognition agreement or framework or accountability mechanism, or to pose a significant risk of committing such an act, related to the Western Balkans, including the Prespa Agreement of 2018; the Ohrid Framework Agreement of 2001; United Nations Security Council Resolution 1244; the Dayton Accords; or the Conclusions of the Peace Implementation Conference Council held in London in December

1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council, or its Steering Board; or the International Criminal Tribunal for the former Yugoslavia, or, with respect to the former Yugoslavia, the International Residual Mechanism for Criminal Tribunals;

(iv) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, serious human rights abuse in the Western Balkans;

(v) to be responsible for or complicit in, or to have directly or indirectly engaged or attempted to engage in, corruption related to the Western Balkans, including corruption by, on behalf of, or otherwise related to a government in the Western Balkans, or a current or former government official at any level of government in the Western Balkans, such as the misappropriation of public assets, expropriation of private assets for personal gain or political purposes, or bribery;

(vi) to be a leader, official, or member of an entity, including a government entity, that has engaged in, or attempted to engage in, any of the activities described in subsections (1)(a)(i)–(v) of this order, or whose property and interests in property are blocked pursuant to this order;

(vii) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order;

(viii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order;

(ix) to own or control, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order; or

(x) to be a spouse or adult child of any person whose property and interests in property are blocked pursuant to subsections (1)(a)(i)–(v) of this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.''

**Sec. 2**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other persons.



THE WHITE HOUSE,
*January 8, 2025.*

[FR Doc. 2025–00622
Filed 1–10–25; 8:45 am]
Billing code 3395–F4–P

Federal Register
Vol. 86, No. 110
Thursday, June 10, 2021

# Presidential Documents

Case 1:26-cv-22587
Exhibit 2

Title 3—

The President

Executive Order 14033 of June 8, 2021

## Blocking Property and Suspending Entry Into the United States of Certain Persons Contributing to the Destabilizing Situation in the Western Balkans

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the International Emergency Economic Powers Act (50 U.S.C. 1701 *et seq.*) (IEEPA), the National Emergencies Act (50 U.S.C. 1601 *et seq.*) (NEA), section 212(f) of the Immigration and Nationality Act of 1952 (8 U.S.C. 1182(f)), and section 301 of title 3, United States Code,

I, JOSEPH R. BIDEN JR., President of the United States of America, hereby expand the scope of the national emergency declared in Executive Order 13219 of June 26, 2001 (Blocking Property of Persons Who Threaten International Stabilization Efforts in the Western Balkans), as amended by Executive Order 13304 of May 28, 2003 (Termination of Emergencies With Respect to Yugoslavia and Modification of Executive Order 13219 of June 26, 2001), finding that the situation in the territory of the former Socialist Federal Republic of Yugoslavia and the Republic of Albania (the Western Balkans), over the past two decades, including the undermining of post-war agreements and institutions following the breakup of the former Socialist Federal Republic of Yugoslavia, as well as widespread corruption within various governments and institutions in the Western Balkans, stymies progress toward effective and democratic governance and full integration into transatlantic institutions, and thereby constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States.

Accordingly, I hereby order:

**Section 1**. (a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:

(i) to be responsible for or complicit in, or to have directly or indirectly engaged in, actions or policies that threaten the peace, security, stability, or territorial integrity of any area or state in the Western Balkans;

(ii) to be responsible for or complicit in, or to have directly or indirectly engaged in, actions or policies that undermine democratic processes or institutions in the Western Balkans;

(iii) to be responsible for or complicit in, or to have directly or indirectly engaged in, a violation of, or an act that has obstructed or threatened the implementation of, any regional security, peace, cooperation, or mutual recognition agreement or framework or accountability mechanism related to the Western Balkans, including the Prespa Agreement of 2018; the Ohrid Framework Agreement of 2001; United Nations Security Council Resolution 1244; the Dayton Accords; or the Conclusions of the Peace Implementation Conference Council held in London in December 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council, or its Steering Board; or the International Criminal Tribunal for the former Yugoslavia, or, with respect to the former Yugoslavia, the International Residual Mechanism for Criminal Tribunals;

(iv) to be responsible for or complicit in, or to have directly or indirectly engaged in, serious human rights abuse in the Western Balkans;

(v) to be responsible for or complicit in, or to have directly or indirectly engaged in, corruption related to the Western Balkans, including corruption by, on behalf of, or otherwise related to a government in the Western Balkans, or a current or former government official at any level of government in the Western Balkans, such as the misappropriation of public assets, expropriation of private assets for personal gain or political purposes, or bribery;

(vi) to have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, any person whose property and interests in property are blocked pursuant to this order; or

(vii) to be owned or controlled by, or to have acted or purported to act for or on behalf of, directly or indirectly, any person whose property and interests in property are blocked pursuant to this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the date of this order.

**Sec. 2**. The prohibitions in section 1 of this order include:

(a) the making of any contribution or provision of funds, goods, or services by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to this order; and

(b) the receipt of any contribution or provision of funds, goods, or services from any such person.

**Sec. 3**. I hereby determine that the making of donations of the types of articles specified in section 203(b)(2) of IEEPA (50 U.S.C. 1702(b)(2)) by, to, or for the benefit of any person whose property and interests in property are blocked pursuant to section 1(a) of this order would seriously impair my ability to deal with the national emergency declared in Executive Order 13219, as amended by Executive Order 13304, and as expanded in this order, and I hereby prohibit such donations as provided by section 1 of this order.

**Sec. 4**. (a) The unrestricted immigrant and nonimmigrant entry into the United States of noncitizens determined to meet one or more of the criteria in section l(a) of this order would be detrimental to the interests of the United States, and the entry of such persons into the United States, as immigrants or nonimmigrants, is hereby suspended, except when the Secretary of State or the Secretary of Homeland Security, as appropriate, determines that the person's entry would not be contrary to the interests of the United States, including when the Secretary of State or Secretary of Homeland Security, as appropriate, so determines, based on a recommendation of the Attorney General, that the person's entry would further important United States law enforcement objectives.

(b) The Secretary of State shall implement this order as it applies to visas pursuant to such procedures as the Secretary of State, in consultation with the Secretary of Homeland Security, may establish.

(c) The Secretary of Homeland Security shall implement this order as it applies to the entry of noncitizens pursuant to such procedures as the Secretary of Homeland Security, in consultation with the Secretary of State, may establish.

(d) Such persons shall be treated by this section in the same manner as persons covered by section 1 of Proclamation 8693 of July 24, 2011 (Suspension of Entry of Aliens Subject to United Nations Security Council Travel Bans and International Emergency Economic Powers Act Sanctions).

**Sec. 5**. (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.

(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.

**Sec. 6**. For the purposes of this order:

(a) the term ''entity'' means a partnership, association, trust, joint venture, corporation, group, subgroup, or other organization;

(b) the term ''noncitizen'' means any person who is not a citizen or noncitizen national of the United States;

(c) the term ''person'' means an individual or entity; and

(d) the term ''United States person'' means any United States citizen, lawful permanent resident, entity organized under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States.

**Sec. 7**. For those persons whose property and interests in property are blocked pursuant to this order who might have a constitutional presence in the United States, I find that because of the ability to transfer funds or other assets instantaneously, prior notice to such persons of measures to be taken pursuant to this order would render those measures ineffectual. I therefore determine that for these measures to be effective in addressing the national emergency declared in Executive Order 13219, as amended by Executive Order 13304, and as expanded by this order, there need be no prior notice of a listing or determination made pursuant to this order.

**Sec. 8**. The Secretary of the Treasury, in consultation with the Secretary of State, is hereby authorized to take such actions, including the promulgation of rules and regulations, and to employ all powers granted to the President by IEEPA as may be necessary to carry out the purposes of this order. The Secretary of the Treasury may, consistent with applicable law, redelegate any of these functions within the Department of the Treasury. All executive departments and agencies of the United States shall take all appropriate measures within their authority to implement this order.

**Sec. 9**. Nothing in this order shall prohibit transactions for the conduct of the official business of the Federal Government by employees, grantees, or contractors thereof.

**Sec. 10**. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.



THE WHITE HOUSE,
*June 8, 2021.*

[FR Doc. 2021–12382
Filed 6–9–21; 11:15 am]
Billing code 3295–F1–P

Case 1:26-cv-22587

Exhibit 3

*Administration of Donald J. Trump, 2025*

**Memorandum on Reviewing Certain Presidential Actions**
*June 4, 2025*

*Memorandum for the Attorney General and the Counsel to the President*

*Subject:* Reviewing Certain Presidential Actions

By the authority vested in me as President by the Constitution and the laws of the United States of America, it is hereby directed:

*Section 1. Background*. The President of the United States, as the unitary head of the executive branch, holds tremendous power and responsibility through his signature: words on paper can become the law of the land, individuals are appointed to some of the highest offices in Government, national policies can be created or eliminated, and prisoners can go free. In sum, the Nation is governed through Presidential signatures.

In recent months, it has become increasingly apparent that former President Biden's aides abused the power of Presidential signatures through the use of an autopen to conceal Biden's cognitive decline and assert Article II authority. This conspiracy marks one of the most dangerous and concerning scandals in American history. The American public was purposefully shielded from discovering who wielded the executive power, all while Biden's signature was deployed across thousands of documents to effect radical policy shifts.

For years, President Biden suffered from serious cognitive decline. The Department of Justice, for example, concluded that, despite clear evidence that Biden had broken the law, he should not stand trial owing to his incompetent mental state. Biden's cognitive issues and apparent mental decline during his Presidency were even "worse" in private, and those closest to him "tried to hide it" from the public. To do so, Biden's advisors during his years in office severely restricted his news conferences and media appearances, and they scripted his conversations with lawmakers, government officials, and donors, all to cover up his inability to discharge his duties.

Notwithstanding these well-documented issues, the White House issued over 1,200 Presidential documents, appointed 235 judges to the Federal bench, and issued more pardons and commutations than any administration in United States history. For instance, just 2 days before Christmas in 2024, the White House announced that Biden commuted the sentences of 37 of the 40 most vile and monstrous criminals on Federal death row, including several child killers and mass murderers.

Although the authority to take these executive actions, along with many others, is constitutionally committed to the President, there are serious doubts as to the decision making process and even the degree of Biden's awareness of these actions being taken in his name.

The vast majority of Biden's executive actions were signed using a mechanical signature pen, often called an autopen, as opposed to Biden's own hand. This was especially true of actions taken during the second half of his Presidency, when his cognitive decline had apparently become even more clear to those working most closely with him.

Given clear indications that President Biden lacked the capacity to exercise his Presidential authority, if his advisors secretly used the mechanical signature pen to conceal this incapacity, while taking radical executive actions all in his name, that would constitute an unconstitutional wielding of the power of the Presidency, a circumstance that would have implications for the legality and validity of numerous executive actions undertaken in Biden's name.

*Sec. 2. Investigation*. (a) The Counsel to the President, in consultation with the Attorney General and the head of any other relevant executive department or agency (agency), shall investigate, to the extent permitted by law, whether certain individuals conspired to deceive the public about Biden's mental state and unconstitutionally exercise the authorities and responsibilities of the President. This investigation shall address:

(i) any activity, coordinated or otherwise, to purposefully shield the public from information regarding Biden's mental and physical health;

(ii) any agreements between Biden's aides to cooperatively and falsely deem recorded videos of the President's cognitive inability as fake;

(iii) any agreements between Biden's aides to require false, public statements elevating the President's capabilities; and

(iv) the purpose of these activities, including to assert the authorities of the President.

(b) The Counsel to the President shall also investigate, in consultation with the Attorney General and the head of any other relevant agency, the circumstances surrounding Biden's supposed execution of numerous executive actions during his final years in office. This investigation shall address:

(i) the policy documents for which the autopen was used, including clemency grants, Executive Orders, Presidential memoranda, or other Presidential policy decisions; and

(ii) who directed that the President's signature be affixed.

*Sec. 3. General Provisions*. This memorandum is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

DONALD J. TRUMP

NOTE: An original was not available for verification of the content of this memorandum.

*Categories:* Communications to Federal Agencies : Certain Presidential actions, memorandum on review.

*Names:* Biden, Joseph R., Jr.

*Subjects:* Attorney General; Former President Joseph R. Biden, Jr., review of certain Presidential actions; Pardons and commutations; White House Counsel.

*DCPD Number:* DCPD202500659.

An official website of the United States government Here’s how you know

U.S. DEPARTMENT OF THE TREASURY

**Case 1:26-cv-22587**

**Exhibit 4**

# Treasury Sanctions Destabilizing Actors and Financial Enablers in Republika Srpska

January 17, 2025

*Using expanded sanctions authorities, Treasury sanctions Republika Srpska President Dodik’s patronage network and individuals in Bosnia and Herzegovina for undermining regional peace and rule of law*

WASHINGTON – On January 8, 2025, the President issued Executive Order (E.O.) 14140, an amendment to E.O. 14033, which expanded the United States government’s ability to curtail activity that undermines, or attempts to undermine, regional peace frameworks and the rule of law in the Western Balkans and efforts to circumvent U.S. sanctions.

Today, the U.S. Department of the Treasury’s Office of Foreign Assets Control (OFAC) is designating five individuals and one entity that facilitate Republika Srpska (RS) President Milorad Dodik (Dodik) and his family’s efforts to enrich themselves at the public’s expense. Today’s action also targets eight individuals who, at Dodik’s direction, organized and executed the

commemoration of “Republika Srpska Day” (RS Day) in January 2024, in contravention to the principles of the Dayton Peace Agreement (DPA) and which the Bosnia and Herzegovina (BiH) Constitutional Court (CC) ruled unconstitutional.

“Today’s action highlights Dodik’s continued efforts to undermine the democratic and multiethnic framework that defines modern-day Bosnia and Herzegovina,” said Acting Under Secretary of the Treasury for Terrorism and Financial Intelligence Bradley T. Smith. “The United States, leveraging our expanded authorities, remains committed to disrupting any attempts by Dodik and his cronies to enrich themselves and destabilize the region.”

## SIGNIFICANT ACTORS CONTRIBUTING TO THE DODIK FINANCIAL NETWORK

The Dodiks’ efforts to enrich themselves led to OFAC’s October 20, 2023, June 18, 2024, November 6, 2024, and December 18, 2024 designations of core parts of the Dodiks’ corrupt patronage network, including several entities and individuals under the direct control of Dodik’s son, Igor Dodik (Igor). While Igor controls many of the companies in this network, he obfuscates his personal connection to the companies by relying on distinct owners and nominal directors. Today’s action builds on OFAC’s recent designations and utilizes the expanded authorities of E.O. 14033, as amended, to hinder attempts to circumvent sanctions.

BiH and Serbian national **Pavle Corovic** (Corovic) is the husband of Dodik's U.S.-designated daughter, Gorica Dodik (Gorica), and the director of U.S.-designated and RS-based Global Liberty d.o.o. Laktasi (Global Liberty) (both designated on October 20, 2023). Along with other Dodik-affiliated entities, Global Liberty has received lucrative incentives from the RS budget.

OFAC is designating Corovic pursuant to E.O. 14033, as amended, for owning or controlling, directly or indirectly, Global Liberty, a person whose property and interests in property are blocked pursuant to E.O. 14033.

BiH-based **Radmila Bojanic** (Bojanic)and **Nemanja Reljin** (Reljin) are the director and owner, respectively, of U.S.-designated Nimbus Innovations d.o.o. Banja Luka (Nimbus) (designated on December 18, 2024). Previously, both Bojanic and Reljin served in the same roles for Sirius 2010 d.o.o. Banja Luka (Sirius) (designated on June 18, 2024) before it formally merged with Nimbus. Both Nimbus and Sirius were designated for being controlled by Igor. Bojanic provided Igor with business updates and solicited Igor's approval before moving forward with business decisions.

OFAC is designating Bojanic and Reljin pursuant to E.O. 14033, as amended, for owning or controlling, directly or indirectly, Nimbus, a person whose property and interests in property are blocked pursuant to E.O. 14033. Bojanic is also being designated pursuant to E.O. 14033, as amended, for being owned or

controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Igor, a person whose property and interests in property are blocked pursuant to E.O. 14033.

To benefit from the businesses both directly and indirectly under his control, Igor relies upon strategic insights from associates responsive to his interests. For example, BiH national **Sinisa Dodik** (Sinisa) has reported to Igor on numerous high-level developments and has advised him on business opportunities. Igor and Serbian national **Marko Gujanicic** (Gujanicic) were publicly identified in a scheme related to media research and public polling in BiH wherein they sought to capitalize on a recent rule change, that was subsequently annulled by a BiH court for being unlawfully restrictive and contrary to the public interest. Both Igor and Gujanicic were involved in the formation of Cyprus-based **SEE Media Research LTD** (SEE Media Research) and local operations in BiH. Igor worked with associates between at least September 2023 and July 2024 to ensure that his preferred company would have a monopoly on measuring TV viewership. Additionally, Gujanicic informed Igor of a strategy to manipulate TV survey responses to further their goals.

OFAC is designating Sinisa and Gujanicic pursuant to E.O. 14033, as amended, for having materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, Igor, a person whose

property and interests in property are blocked pursuant to E.O. 14033.

OFAC is designating SEE Media Research pursuant to E.O. 14033, as amended, for being owned or controlled by, or having acted or purported to act for or on behalf of, directly or indirectly, Gujanicic, a person whose property and interests in property are blocked pursuant to E.O. 14033, as amended.

## ORGANIZERS OF REPUBLIKA SRPSKA DAY

On January 8–10, 2024, the RS government organized celebrations of RS Day in defiance of prior BiH Constitutional Court (CC) decisions that held that the commemoration of January 9 unconstitutional due to its violation of the BiH constitutional obligation of non-discrimination. These events were explicitly organized by the RS government. Specifically, Dodik personally oversaw and directed efforts to organize and commemorate RS Day 2024. In response to these commemorations of January 9, the High Representative stated that the celebration of January 9 as RS Day represented “a clear and direct failure to implement the final and binding decisions of the BiH CC” and noted that such non-compliance with BiH CC rulings constituted a criminal offense under the BiH criminal code. By openly defying the decisions of both the BiH CC and High Representative — two bodies whose authorities are enshrined in

the Dayton Peace Agreement (DPA) and are critical to upholding it — the actions undertaken by the RS government, and directed by Dodik, undermine the DPA.

BiH-based RS Minister of Interior **Sinisa Karan** (Karan), Chief of Staff in the Office of the RS President **Danijel Dragicevic** (Dragicevic), Head of the RS Protocol Office **Goran Rakovic** (Rakovic), RS Secretary General **Dalibor Panic** (Panic), Director of Radio Television Republika Srpska **Dijana Milankovic** (Milankovic), President of the RS Constitutional Court **Dzerard Selman** (Selman), President of the RS Academy of Arts and Sciences **Rajko Kuzmanovic** (Kuzmanovic), and Chief of Cabinet to the RS National Assembly (RSNA) Speaker **Goran Filipovic** (Filipovic) — alongside three additional members of the 2024 RS Day Organizing Committee whom the United States designated on March 13, 2024 — proposed, adopted, and implemented the plan of events for the 2024 commemoration of RS Day.

Beyond his lead role in overseeing the 2024 event, Dodik more recently directed the planning of RS Day 2025. To assist in planning RS Day 2025, Dodik directed public officials — including Dragicevic, Karan, Milankovic, Selman, and Panic — to support various organizing efforts. All of these officials agreed to follow Dodik's instructions and worked to ensure RS Day 2025 events were organized according to his wishes. Karan, Dragicevic, Rakovic, Panic, Milankovic, Selman, and Kuzmanovic were

Case 1:26-cv-22587-XXXX Document 1-1 Entered on FLSD Docket 08/15/2026 Page 47 of 49

formally appointed to serve on the 2025 RS Day Organizing Committee by the RSNA. In spite of repeated declarations by the BiH CC and the High Representative, these officials have continued to engage in behavior that undermines the DPA.

In addition to these efforts, in 2024, Dodik instructed several Alliance of Independent Social Democrats (SNSD) officials to convene a working group to draft a plan for the RS to secede from BiH. Both Karan and Panic were part of this secessionist working group that drafted the secession plan for Dodik.

OFAC is designating Karan, Dragicevic, Rakovic, Panic, Milankovic, Selman, Kuzmanovic, and Filipovic pursuant to E.O. 14033, as amended, for being responsible for or complicit in, or having directly or indirectly engaged or attempted to engage in, a violation of, or an act that has obstructed or threatened the implementation of, any regional security, peace, cooperation, or mutual recognition agreement or framework or accountability mechanism, or posing a significant risk of committing such an act, related to the Western Balkans, including the Prespa Agreement of 2018; the Ohrid Framework Agreement of 2001; United Nations Security Council Resolution 1244; the Dayton Accords; or the Conclusions of the Peace Implementation Conference Council held in London in December 1995, including the decisions or conclusions of the High Representative, the Peace Implementation Council, or its Steering Board; or the International Criminal Tribunal for the former Yugoslavia, or, with

respect to the former Yugoslavia, the International Residual Mechanism for Criminal Tribunals.

## SANCTIONS IMPLICATIONS

As a result of today's action, all property and interests in property of the designated persons described above that are in the United States or in the possession or control of U.S. persons are blocked and must be reported to OFAC. In addition, any entities that are owned, directly or indirectly, individually or in the aggregate, 50 percent or more by one or more blocked persons are also blocked. Unless authorized by a general or specific license issued by OFAC or exempt, U.S. sanctions generally prohibit all transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of designated or otherwise blocked persons.

Violations of U.S. sanctions may result in the imposition of civil or criminal penalties on U.S. and foreign persons. OFAC may impose civil penalties for sanctions violations on a strict liability basis. OFAC's Economic Sanctions Enforcement Guidelines provide more information regarding OFAC's enforcement of U.S. economic sanctions. In addition, financial institutions and other persons may risk exposure to sanctions for engaging in certain transactions or activities with designated or otherwise blocked persons.

The power and integrity of OFAC sanctions derive not only from OFAC's ability to designate and add persons to the Specially Designated Nationals and Blocked Persons (SDN) List, but also from its willingness to remove persons from the SDN List consistent with the law. The ultimate goal of sanctions is not to punish, but to bring about a positive change in behavior. For information concerning the process for seeking removal from an OFAC list, including the SDN List, please refer to OFAC's Frequently Asked Question 897 here. For detailed information on the process to submit a request for removal from an OFAC sanctions list, please click here.

For identifying information on the individuals and entity sanctioned today, click here.

###